IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FEESERS, INC.,

    **Plaintiff,**

  **v.**

MICHAEL FOODS, INC. and
SODEXHO, INC.,

    **Defendants.**

:
:
:
:
:
:
:
:
:
:
:
:

CIVIL NO. 1:CV-04-0576

**JUDGE SYLVIA H. RAMBO**

**M E M O R A N D U M**

   Before the court are the following motions: 1) Plaintiff Feesers, Inc.'s
Motion for Summary Judgment (Doc. 128); 2) Defendant Michael Foods, Inc.'s
Motion for Summary Judgment (Doc. 116); and 3) Defendant Sodexho, Inc.'s
Motion for Summary Judgment (Doc. 110).  All of the motions have been briefed
and are ready for disposition.  For the following reasons, the court will deny
Plaintiff's motion and grant Defendants' motions.

**I.**    **Background**

   The following facts are undisputed, except where noted.

  **A.**   **The Parties**

   Plaintiff Feesers, Inc. (hereinafter "Feesers") is a full line (also called
"broadline") food service distributor that carries over 13,000 products and maintains
a client base in Pennsylvania, New Jersey, Maryland, Delaware, and Northern
Virginia.  The products consist of a full range of food and other products used by
customers that prepare and serve food on their premises.  Feesers' customers include

institutions such as public and private elementary schools, college and university dining services, healthcare facilities (such as hospitals, nursing homes, and assisted-living facilities), corporate cafeterias, and restaurants and other customers that cook and serve prepared foods.

Defendant Michael Foods, Inc. (hereinafter "Michael Foods") is a manufacturer of egg and potato products, which the company packages and sells in bulk to wholesale food distributors throughout the United States.  Defendant Sodexho, Inc. (hereinafter "Sodexho") is an international food service management company that operates and manages food service operations for other companies and institutions.  In the course of providing such services, Sodexho contracts with broadline distributors to procure the required food and food-related products (e.g. paper goods, cleaning supplies, etc.).

## B.   The Food Service Industry

The court will not attempt to describe the food service industry in full detail, but will introduce some relevant aspects here.  The food service industry encompasses all of the business forms that participate in providing institutional end users with the products and services required to maintain their food service operations.  For example, some relevant end users here are institutions that provide prepared meals such as acute care facilities or nursing homes and corporations or universities that offer cafeterias or more commercialized dining options on site.[1]

End users have a number of choices in determining both how they provide food services and how they get products from the manufacturers.  One

---

[1] These are just a few examples of end users within the foodservice industry and not an exhaustive list.

option is for end users to handle all aspects of their food service operations themselves.  These end users are known as "self-operators," or "self-ops."  Another option is to outsource all aspects of food service, including product procurement, preparation, sales, and staffing, to a foodservice management company like Sodexho.  Even where end users contract with Sodexho or similar companies, they may still choose a variety of options with respect to specific staffing and sales arrangements.

Yet another option for end users is to remain a "self-op" but contract with a group purchasing organization, or "GPO," that negotiates various agreements with manufacturers and distributors then makes the terms of those agreements available to its clients.  GPOs do not provide or otherwise arrange for food management services.  Clients choose which entities they purchase from and place their own orders, but obtain any benefits of the agreements that the GPO has negotiated with the chosen vendor.  Sodexho has a subsidiary, Entegra, that operates as a GPO.

Regardless of which business arrangement an end user chooses, manufacturers and distributors are required parts of the chain.  Food and food-related products are produced and packaged by manufacturers which then sell in bulk to distributors.  Neither food service management companies (like Sodexho) nor GPOs (like Entegra) warehouse or distribute food and food-related products themselves.

In the food service industry it is not uncommon for management companies to enter into "prime distributor agreements" with distributors.  Feesers was the primary distributor for a food service management company called The

Wood Company (hereinafter "Wood") for many years; Feesers' last such agreement with Wood covered the time period from January 1, 1998 until December 31, 2002 (hereinafter "the 1998 agreement").  In 2001, Sodexho acquired Wood and Feesers became a prime distributor for Sodexho under the terms of the 1998 agreement. Despite Feesers' efforts to extend this prime distributor relationship with Sodexho when the 1998 agreement terminated, Sodexho chose Sysco Corporation (hereinafter "Sysco") as its prime distributor in central Pennsylvania.  However, Sodexho did not do so until 2003; Feesers continued to sell certain food and food-related products to Sodexho from 2002 (when the 1998 agreement expired) until 2003 (when Sodexho chose Sysco).

**C.     Pricing in the Food Service Industry**

The most basic approach to pricing within the food service industry involves the manufacturers generating price lists that set forth the prices at which they sell food and food-related products to distributors.  Distributors in turn sell to GPOs, food service management companies, and self-ops at the manufacturer list prices plus a percentage mark-up that reflects the distributors' costs in procuring and delivering the commodities; this is called "cost plus" pricing.  However, the basic pricing arrangement is subject to a number of variations, including deviated prices or deviated bill-backs, rebates, and allowances.  Distributors and food management service companies may avail themselves of any and all of these variations through agreements with manufacturers.

Sodexho has negotiated deviated pricing from Michael Foods.  Michael Foods sells products to Sysco at list prices; however, Sodexho and Michael Foods have negotiated deviated pricing for all products that Sysco distributes to Sodexho.

4

Sysco provides Michael Foods with proof of delivery of products to Sodexho or Sodexho accounts[2] and then invoices Michael Foods for the difference between the list price and the negotiated deviated price.  Sysco and Sodexho negotiate Sysco's cost plus pricing based on Sodexho's deviated pricing agreement with Michael Foods.  Thus, although Sysco is not involved in the negotiation of the Michael Foods-Sodexho pricing agreement, Sysco's resale price of Michael Foods' products to Sodexho reflects that agreement.

Similarly, some of Feesers' customers have negotiated deviated billback programs with Michael Foods.  Such arrangements result from negotiations between the Feesers customer and Michael Foods, and Feesers, like Sysco with respect to its Sodexho sales, provides proof of sales to Michael Foods and invoices the manufacturer for the difference.  In addition, in October 2003, Michael Foods offered to provide Feesers with Sodexho-equivalent deviated pricing on Michael Foods products that Feesers attempts to sell to any existing Sodexho customer, as well as for any potential customer that is considering proposals from both Feesers and Sodexho.

Another pricing variation is the direct rebate.  A rebate is determined in much the same way as deviated billing.  However, the management company pays a rebate directly to the food service management company, or whichever entity negotiated the below list pricing.  Rebates are not funneled through a distributor.  In addition to deviated pricing and rebates, entities within the food service industry also frequently receive allowances based upon marketing and earned income programs

---

[2]  Because Sysco orders in bulk for all of its clients it must then provide proof of sales to Michael Foods to identify which of the products it sells to Sodexho.

where various allowances and rebates are earned based on purchases from manufacturers.[3]  Marketing allowances, however, are not considered "pure" discounts because manufacturers provide them in return for reciprocal promotion or marketing of the manufacturer's brand of products.  Distributors are expected to use the allowances to support these promotional activities and, therefore, rarely pass the allowances on to their customers.

The parties do not dispute that the pricing arrangement between Michael Foods and Feesers is different from the one governing the relationships among Michael Foods, Sysco, and Sodexho.  Pricing agreements, be they deviated bill-backs, rebates, or allowances are negotiated on a case-by-case basis by the parties involved.  As a result, it is not uncommon for different entities to receive different pricing arrangements.  Both Feesers and Sodexho participate in various allowance programs in order to receive allowances from Michael Foods.  Feesers is also a member of UniPro Food Services, Inc. (hereinafter "UniPro"), a food distributor consortium that negotiates allowances from Michael Foods for all of its members, including Feesers.  However, the product prices that Feesers used as a basis for comparison in the instant matter do not reflect any such rebates or allowances,[4] and the parties agree that neither company is obligated to pass on such allowances to their customers.  Rather, the Feesers prices used here are the list prices that Michael Foods provides to all distributors and the Sysco-Sodexho prices used reflect only the

---

[3]  For purposes of the instant action, rebates and allowances are interchangeable.

[4]  Feesers initially filed a declaration of its expert, Dr. Larner, which did not reflect rebates and allowances.  Feesers filed a second declaration, however, which included rebates and allowances in the calculations; however, the second set of numbers covered only a portion of the years covered by the first set.  The court finds the reports submitted in conjunction with the first declaration to be sufficient for the purposes of its instant inquiry.

deviated pricing arrangement between Michael Foods and Sodexho, not any additional allowances.[5]

### D.   **Procedural History**

On March 17, 2004, Feesers filed a two-count complaint against Michael Foods and Sodexho.  In Count I, Feesers alleged that Michael Foods violated section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), by selling goods to Sodexho at more favorable prices than those made available to Feesers.  In Count II, Feesers alleged that Sodexho violated section 2(f) of the Robinson-Patman Act, 15 U.S.C. § 13(f), by improperly inducing Michael Foods to engage in price discrimination.  Defendant Sodexho filed a motion to dismiss on May 12, 2004, which the court denied on October 27, 2004.

On May 19, 2005, Michael Foods filed a motion for summary judgment, which was subsequently continued and ultimately terminated by Michael Foods on October 13, 2005.  The instant summary judgment motions were filed by Plaintiff Feesers and Defendants Michael Foods and Sodexho on November 17, 2005.  On March 29, 2006, the court held a hearing on select issues pertaining to the summary judgment motions.

---

[5] Feesers has also provided some information regarding sales from other manufacturers, McCain, Schwan's, and Ecolab, to Sodexho, none of whom are parties in the instant action.  In addition to the court's concern that such information goes beyond the scope of what is relevant to the dispute involving the instant defendants, is the fact that only limited information was available, which Dr. Larner admits in his initial report.  For these reasons, and because the court is able to sufficiently address the relevant issues in the instant summary judgment motions without it, the court will not review the McCain, Schwan's, and Ecolab information here.

## II.        <u>Legal Standard – Summary Judgment</u>

_____Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id.* at 249.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial."  *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial."  *Celotex*, 477 U.S. at 322-23.

" 'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.' " *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

The standards governing the court's consideration of Federal Rule 56(c) cross-motions are the same as those governing motions for summary judgment, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. *Raymond Proffitt Found. v. U.S. Envtl. Prot. Agency*, 930 F. Supp. 1088, 1096 (E.D. Pa. 1996).

## III.        Discussion

### A.        15 U.S.C. § 13(a)

In order to establish a violation under § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), a plaintiff must prove 1) sales to two different purchasers in interstate commerce, 2) of goods of the same grade and quality, 3) that the seller discriminated in price between the two purchasers, and 4) that the discrimination had a prohibited effect on competition.[6] *Texaco v. Hasbrouck*, 496 U.S. 543, 556 (1990).

---

[6] Section 2(a) of the Robinson-Patman Act provides, in relevant part:

(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly

(continued...)

There is no dispute that the instant action involves goods of the same grade and quality; thus, the parties' arguments turn primarily on the first, third, and fourth elements. Defendants challenge whether price discrimination exists, as well as Feesers' ability to establish that there is a second purchaser within the meaning of the statute. In the alternative, Defendants argue that Feesers is unable to satisfy the competitive injury requirement. Feesers maintains that it is able to satisfy all elements and is, therefore, entitled to summary judgment. The court will address each issue below.

## 1. **Price Discrimination**

A fundamental requirement of a price discrimination claim under § 2(a) of the Robinson-Patman Act is the third element, the requirement that there must be price discrimination. "Price discrimination within the meaning of [§ 2(a)] is merely a price difference." *Hasbrouck*, 496 U.S. at 558. Michael Foods argues that there is a genuine dispute regarding whether there is price discrimination because the sales to both Feesers and Sysco are based on list prices and any adjustments occur post-sale through billbacks.

The court finds most relevant the undisputed evidence that Sysco bills Sodexho based on a cost plus of the *deviated* price rather than the list price. Although Sysco may initially pay the list price, it subsequently bills Michael Foods back for any products sold to Sodexho. Thus, with respect to the products at issue

---

[6](...continued)
receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).

here, it is not accurate to say that Sysco pays the list price.  Michael Foods does not dispute that the ultimate price is different than the price made available to Feesers.

Michael Foods further argues, however, that movable volume commitment discounts such as those negotiated by Sodexho are "functionally available on an equivalent basis" to Feesers through UniPro, but Feesers has not pursued them.  Feesers counters that this is pure speculation and that the undisputed evidence shows that Michael Foods does not participate in a volume discount program with UniPro.  Thus, Feesers argues, no such discount is available for Feesers.  The court agrees.  Michael Foods has adduced no evidence to support this theory.  Thus, because the facts that establish that Michael Foods sold products at different prices are not in dispute, the court finds that price discrimination exists within the context of the Act.[7]

However, price discrimination alone is insufficient for a violation.  "Rather, in order to establish a prima facie violation of section 2(a), 'a reasonable possibility of harm, often referred to as competitive injury, must be shown.' "  *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1271 (3d Cir. 1995) (quoting *J.F. Feeser, Inc. v. Serv-a-portion, Inc.*, 909 F.2d 1524, 1532 (3d Cir.

---

[7]  Michael Foods posits that its offer to extend the same deviated billback arrangement that Sysco receives to Feesers moots any issues regarding discrimination.  Feesers counters that because Michael Foods' "offer" is not so expansive as to include all of Feesers' customers rather than simply those that are specifically considering Sodexho bids, it does not sufficiently eliminate discrimination.  Moreover, Feesers argues that Michael Foods' unwillingness to make an identical offer or one that is contractually binding warrants concern that the offer constitutes conduct merely intended to forestall legal action which could be resumed when the threat of litigation has passed.  *See United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333 (1952); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 48 (1960).  The court agrees that the offer as described by Michael Foods might fail to address all circumstances in which price differences might exist and would not eliminate the risk of repeat conduct.  Accordingly, the court finds that the offer to provide equivalent pricing in certain limited situations fails to moot the existence of price discrimination.

1990)).  Before the court reaches the issue of competitive injury, however, it will

address the challenges that Defendants raise with respect to first element of a § 2(a)

claim.

## 2.  Two Purchasers and Third-line Injury

The parties devote significant portions of their briefs to § 2(a)'s first

element, the requirement that the seller, here Michael Foods, sells to two different

purchasers.  In particular, the parties debate whether Sodexho is a purchaser in the

"upstream" transaction, the transaction in which Michael Foods is the seller.

Michael Foods argues that it never sells directly to Sodexho, but rather sells to

Sysco, which then sells to Sodexho in the "downstream" transaction.  Feesers

counters with testimony of its expert, Dr. Larner, and advocates that a "substance

over form" approach establishes an economic reality where Sodexho is the true

direct purchaser because it negotiates the prices and controls the quantities involved

in Michael Foods' sales to Sysco with respect to products for Sodexho.  However,

Feesers maintains that even if the court does not find Sodexho to be the direct

purchaser, discrimination that results in indirect or "third-line" level competitive

injury is actionable.[8]

The parties rigorously debate the merits of Dr. Larner's economic reality

theory and whether Sodexho is a § 2(a) purchaser under the theory.  Although there

is support for the base line principle that the court should look to economic realities

---

[8] Feesers contends that at least some of its potential customers are also potential customers of Sodexho.  If, as Feesers alleges, Michael Foods sells at more favorable prices to Sysco, who passes on those prices when it sells to Sodexho, who then also passes on the prices when it competes for customers with Feesers, the question of injury occurs at the third line of distribution from the seller.  Thus, this is a case of third-line discrimination, also called tertiary discrimination.  *See* 3-39 Antitrust Laws & Trade Reg. (MB) § 39.03 (2d ed. 2006).

rather than superficial labels in reviewing questions of price discrimination under § 2(a),[9] the court is not certain whether the principle goes so far as Feesers and Dr. Larner attempt to stretch it.  However, the court finds it unnecessary to attempt to resolve that particular question when the present factual scenario and injury alleged fall squarely within the third-line injury framework provided for in statute as well as case law.

Section 2(a) states that "[i]t shall be unlawful for any person engaged in commerce, . . . either directly or *indirectly*, to discriminate between different purchasers . . . ."  15 U.S.C. § 2(a) (emphasis added).  It also prohibits discrimination that injures "any person who either grants or knowingly receives the benefit of such discrimination, *or with the customers of either of them*."  *Id.* (emphasis added).  The statutory language thus expressly prohibits discrimination that damages subsequent line competition.

Supreme Court case law also establishes that tertiary injury cases fall within the scope of § 2(a).  In *Standard Oil Co. v. FTC*, the Court considered the FTC's findings with respect to Robinson-Patman Act violations where Standard Oil sold to retail stations at less favorable pricing than to "jobbers" who in turn sold to retail stations.  340 U.S. 231, 235 (1951).  The Court's decision did not question the validity of third-line injury as a cause of action.  *See id.*  Moreover, the Supreme Court has addressed indirect discrimination cases in a manner that is consistent with

---

[9] "Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.  This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.' " *Eastman Kodak Co. v. Image Technical Svcs, Inc.*, 504 U.S. 451, 466-67 (1992).  The Supreme Court advocated looking to the "economic realities."  *Id.* at 467.  Moreover, "[a]ntitrust policy requires the courts to seek the economic substance of an arrangement, not merely its form."  *Weiss v. York Hospital*, 745 F.2d 786, 815 (3d Cir. 1984).

the statutory prohibition.  *See Hasbrouck*, 496 U.S. at 560 ("the law should tolerate no subterfuge").  The *Hasbrouck* court went so far as to find that fourth-line injury is sufficient to sustain a § 2(a) violation because a limitation excluding fourth-line competition would be " 'wholly an artificial one.' "  *Id.* at 567 (quoting *Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 648-49 (1969)).  The Supreme Court reasoned that "competitive harm . . . is certainly no less because of the presence of an additional link in [the] chain from the producer to the retailer."  *Id.*

The parties do not dispute that Michael Foods sells its egg and potato products to Sysco and Feesers.  Thus, one seller sells to two purchasers.  If Sysco then sells to Sodexho and Feesers and Sodexho are competitors, then the instant facts correspond to the *Standard Oil* tertiary injury model.[10]  Defendants also raise several challenges to Feesers' ability to maintain a third-line claim, which the court will address before turning to the issue of competitive injury.

### a.    Post-sale Rebates

Michael Foods first challenges the tertiary injury claim by characterizing the instant dispute as one about post-first-sale rebates to which § 2(d) of the Robinson-Patman Act, which Feesers did not plead, applies.[11]  Section 2(d)

---

[10] Defendants also dispute whether Feesers and Sodexho are competitors.  These arguments are more relevant to the issue of competitive injury, which the court addresses below; at this juncture, it is sufficient to say that the third-line injury model provides the appropriate framework for the court's review.  The court will not reach the issue of whether Sodexho is a direct "economic" purchaser from Michael Foods.

[11] Section 2(d) provides:

It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for

(continued...)

prohibits discriminatory advertising and promotional allowances.  However, the court agrees with Feesers that the deviated pricing at issue here is not the equivalent of advertising and promotional allowances, which have been discussed throughout briefing by both parties as separate categories of allowances that neither party passes on when reselling the products.  The court also agrees that although the deviations are paid after the first transaction, the agreement that they will be paid exists from the start.  Thus, the economic reality is that the first sale occurs in two steps that are clearly mapped out and agreed upon in advance before any transaction occurs. Moreover, restricting the reach of § 2(a) to preclude its application to discriminatory deviated pricing arrangements that fall outside the post-first-sale categories specified in § 2(d), or in §§ 2(c) and 2(e),[12] would circumvent § 2(a)'s explicit prohibition against indirect forms of discrimination.  Accordingly, Michael Foods' § 2(d) arguments are misplaced.

### b.  Failure to Describe Injunctive Relief Sought with Sufficient Specificity

Michael Foods next argues that Feesers fails to satisfy traditional principles of equity because it has not described the injunctive relief sought with sufficient specificity.  Michael Foods characterizes Feesers' challenge as one against

---

[11](...continued)
any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d).

[12] Michael Foods also discusses the possibility that §§ 2(c) and 2(e) of the Robinson Patman Act, 15 U.S.C. §§ 13(c) and 13(e), are more applicable than § 2(a).

industry-wide deviated billing practices and maintains that such an injury cannot be addressed by singling out Michael Foods versus other manufacturers.  The court is satisfied that Feesers has not broadly attacked deviated billing practices, but specifically those of Michael Foods.  Feesers clearly maintains that Michael Foods' deviated billing agreement with Sodexho goes beyond what is permissible under the Robinson Patman Act and seeks relief tailored to that claim.  The court finds no reason to suspend its review based on the form of Feesers' request for relief.

### c.    Indirect Purchaser Doctrine

Defendants also attempt to respond at least in part to Feesers' tertiary injury claim by invoking the Third Circuit's indirect purchaser doctrine.  It is well-settled that in the Third Circuit harm to indirect purchasers may not be considered in determining damage awards.  *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968) (defendants may not argue passing on of unfavorable prices to indirect purchasers as a defense to claims under § 4 of the Sherman Act).  In *Illinois Brick Co. v. Illinois*, the Third Circuit extended the doctrine to the offensive context, holding that plaintiffs are precluded from showing injury where they are indirect purchasers claiming injury that has been "passed on." 431 U.S. 720, 726 (1977).  The Third Circuit further extended the doctrine to Robinson-Patman Act § 2(a) cases in *Edward J. Sweeney & Sons, Inc. v. Mission Gas Oil Co.*, 637 F.2d 105, 122 (3d Cir. 1980).

Michael Foods' attempt to use this doctrine to refute Feesers' standing to bring a third-line injury claim is misplaced.  The doctrine applies to disputes between parties that are within the same distribution or sales chain.  In other words, the indirect purchaser doctrine would effectively preclude Feesers' customers from

being plaintiffs against Michael Foods where they alleged injury via discrimination that Feesers' passed on to them.  The indirect purchaser doctrine has not been used to preclude claims brought by parties who allege injury arising from price discrimination between entities in different lines of distribution, even where those entities occupy different functional levels.  Moreover, such a finding would be in direct conflict with the established Supreme Court precedent discussed above regarding subsequent line injury.

### d.     Form of Goods Sold by Sodexho

Michael Foods further argues that Sodexho does not resell products in their original form, but only uses them in the prepared meals that it sells.  Feesers does not sell prepared foods; thus, Michael Foods maintains that Sodexho and Feesers do not compete for such sales and they do not provide a viable basis for Feesers' § 2(a) claim.[13]  The court is not persuaded by Michael Foods' argument because the relevant transaction is not the transaction in which the prepared meal is conveyed to the individual consuming the meal, but the transaction in which Sodexho provides the food products to the institutional user.  The fact that Sodexho is on site and also involved in the preparation and sales to the individual consumer of the prepared meal does not supplant the relationship between Sodexho and its accounts.[14]  The Sodexho proposals and contracts that Feesers has provided as

---

[13]  Michael Foods raises the resale argument in connection with the question of whether Sodexho is a statutory purchaser.  The court has already stated that it will not address the purchaser dispute, but interprets Michael Foods' resale argument as relevant within the context of whether, under a third-line injury model, the requisite goods of the same grade and quality are involved.

[14]  In reaching this conclusion, the court must resolve another of Michael Foods' challenges – that Sodexho and its client form one economic unit.  Again, Michael Foods makes this argument in

(continued...)

evidence establish that Sodexho, at least in some cases, accounts for food costs as a separate line item within operating costs when billing accounts. Accordingly, the form of the goods involved in the transaction between Sodexho and its immediate customers, its clients, is the same as that of the goods that Feesers resells. Defendants' resale argument, as well as the other attempted third line injury challenges, fail to provide a sufficient basis to refute Feesers' discrimination claim.

### 3. <u>Competitive Injury</u>

As noted above, price discrimination alone is insufficient for a violation. "Rather, in order to establish a prima facie violation of section 2(a), 'a reasonable possibility of harm, often referred to as competitive injury, must be shown.' " *Stelwagon Mfg. Co.*, 63 F.3d at 1271 (quoting *J.F. Feeser, Inc. v. Serv-a-portion, Inc.*, 909 F.2d 1524, 1532 (3d Cir. 1990)). This competitive injury or causation requirement exists "regardless of the 'level' in the chain of distribution on which the injury occurs." *Perkins*, 395 U.S. at 648.

---

[14](...continued)
connection with the purchaser dispute; however, it is also relevant to the resale issue. An underlying premise of Sodexho's "single unit" argument is that Sodexho cannot make a "sale" internally within one entity. The Sixth Circuit has held that there is no sale for Robinson-Patman purposes when a corporation sells to its subsidiary. *See Russ Kwik Car Wash v. Marathon Petroleum Co.*, 772 F.2d 214 (6th Cir. 1985) (relying upon the principle that because a corporation and its subsidiary have identical interests they are incapable of conspiring with each other in violation of antitrust laws, established by *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)). The court recognizes that on the surface there are a number of similarities between the instant facts and those of *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125 (3d Cir. 1995), which extended *Copperweld* to the relationship between a contract carrier and its agents. Here, a management company handles the day-to-day operations for its clients, is contractually obligated to manage the clients' affairs, and receives fees that are percentages of the clients' revenues from prepared food sales. *See id.* at 1135-35. However, the critical difference here is that the primary business of Sodexho's customers is not food service. Rather, they are institutional entities operating in completely unrelated fields; e.g. education, health care, senior care, etc. Therefore, the court does not agree that Sodexho's interests and those of its customers are identical, even though they may share some interests relating to the food service operations. The court will not consider Sodexho and its clients as single economic entities.

"Under the *Morton Salt* test, a plaintiff can show injury to competition by providing either proof of a substantial price discrimination between competing purchasers over time or by providing direct proof of lost sales or profits." *J.F. Feeser, Inc. v. Serv-a-Portion, Inc.*, 909 F.2d 1524, 1529 (3d Cir. 1990); *See also FTC v. Morton Salt Co.*, 334 U.S. 37, 46-47 (1948)); *Hasbrouck*, 496 U.S. at 559. Demonstrating a reasonable possibility of harm "suffices to support injunctive relief." *J.F. Feeser, Inc.*, 909 F.2d at 1531.  In addition, a court may find competitive injury where discrimination "occurs in a market with low profit margins and intensive competitive conditions." *Id.* at 1538.

However, before reaching the competitive injury test, the court must first address the threshold question of whether two entities are functionally in competition with one another.  A plaintiff cannot establish competitive injury unless it can demonstrate that " 'as a disfavored purchaser, it was engaged in *actual competition* with the favored purchaser[] as of the time of the price differential.' " *Id.* at 1534 (quoting *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 584 (2d Cir. 1987)) (emphasis added).  Thus, the plaintiff must show that the price differential injured it as a competitor as opposed to merely showing that the alleged discriminatory pricing harmed competition in general.  *Id.* at 1533-35.

The fact that two companies operate under different business forms or labels does not necessarily preclude a finding of a § 2(a) violation.  *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 142 (2d Cir. 1998).  The court's inquiry "is simply a factual process which focuses on whether these purchasers were directly competing for resales among the same group of customers." *Id.* at 141-42. Moreover, in deciding whether two companies compete at the same functional level,

the court must view "the record as a whole" and consider the economic realities at issue. *Stelwagon Mfg. Co.*, 63 F.3d at 1272.

Defendants contend that, unlike the parties in *Hasbrouck* and *George Haug Co.*, Feesers and Sodexho have never been in *actual* competition with one another because procurement and distribution are merely incidental to the suite of food management services that Sodexho provides. Feesers argues that so long as procurement is a portion of what Sodexho offers, the actual competition requirement is satisfied. Feesers further relies on evidence that customers choose to go from self-op to outsourcing and back, including specific examples of companies that were Feesers clients who elected to outsource and contracted with Sodexho, and vice versa.

The court finds that Feesers fails to adduce sufficient evidence to establish that Feesers and Sodexho are actual competitors within the meaning of § 2(a) of the Robinson-Patman Act. Although the undisputed evidence establishes that the food services industry is highly competitive and that an end user broadly has a number of options within that industry, those options are tied to functional differences between the various business forms. Dr. Scheffman's testimony that non-food factors drive a company's decision to be a self-op or to outsource supports this view. The undisputed evidence supports this position as well. Feesers fails to show that an end user's choice between a GPO, food service management company, or a distributor is tied to food cost alone and amounts to the form of direct competition required by the Act.

Feesers provides a list of approximately 600 companies that it considers to be prospective clients of both Feesers and Sodexho and therefore proof that the

two companies are actual competitors.[15]  It discusses about twelve companies in
detail.  The evidence adduced regarding these companies reveals at most that some
companies were self-op at one time but then decided to outsource food management
services and subsequently hired Sodexho.  In some cases, Feesers' employees
admitted that they were not aware of why companies made the decision to convert
from self-op to managed services.  In others, Feesers was the distributor for
companies that had contracted with Wood for food management services when
Feesers was Wood's primary distributor; Feesers lost their distribution business
when Sodexho bought out Wood then later switched to Sysco for the distribution
component (e.g., Bucknell University).  In another case, the decision to switch
between self-op and managed services occurred after the in-house food service
director retired (St. Mary's School in Annapolis, Maryland).  In other cases still, the
evidence indicates that companies' decisions to transition from self-op to managed
services occurred before those companies requested proposals from Sodexho.  In two
instances Feesers pointed to prospective competition where Sodexho submitted
proposals for a maintenance program (Garden Spot Village) and transportation
services (The Reading Hospital and Medical Center).  Such circumstances fail to
establish that Feesers and Sodexho compete on the same functional level.

　　　　　In only the instance of the Meadows Nursing Home's return to self-op
and Feesers from Sodexho's managed services did Feesers present any evidence that
touched upon distribution services as a decisional factor.  It is undisputed that
Michael Foods offered Feesers pricing that matched its pricing to Sodexho because
the Meadows was a Sodexho client, however, Feesers failed to establish that the

---

[15]  Feesers compiled the list from a client report generated by Sodexho during discovery.

availability of that pricing was the determining factor for the Meadows in making the switch.  The testimony of James States, Feesers' Director of Sales also indicates that the Meadows was dissatisfied with Sodexho's services in some respects. Accordingly, the facts do not support a finding that the decision was based solely or primarily on food costs or that Sodexho and Feesers were engaged in competition at the same functional level.  Moreover, the weight of the evidence otherwise fails to support such a finding.

In sum, nothing in the evidence suggests that the cost of procurement services is somehow a determining factor in the decision to remain self-op or to outsource.  In addition to the evidence discussed above, Sodexho's promotional materials and request for proposals ("RFPs") responses repeatedly emphasize the value in their bundle of services.  Even where Sodexho addresses procurement costs and what impact they may have on the budget as a whole, it frequently mentions reduced costs in conjunction with various procurement related programs and services.  Sodexho does not imply that procurement costs are an overriding aspect of its proposals, but frequently mentions that costs aside, it is the services that Sodexho provides that should be the focus.  Moreover, although there is only scant direct evidence of the views of prospective customers, the few RFPs that are included fail to suggest that the interest in outsourcing is primarily driven by procurement and distribution costs.  Finally, Sodexho's identification of the self-op market for growth opportunities in its strategic planning documents does not alter the court's finding here.  The documents do not convey a plan to alter Sodexho's business plan or the fact that Sodexho seeks to provide its bundle of services to prospective customers.

Its manner of seeking business within the self-op market is functionally different than that of Feesers.

Feesers' efforts to satisfy the actual competition element with respect to Entegra similarly fail. The undisputed facts are that Entegra negotiates agreements but is otherwise not involved in the selection of distributor, placement of orders, or storage and distribution of goods. The companies that contract with Entegra are independently responsible for those functions. Thus, Entegra and Feesers do not compete on the same functional level.

The court's finding that Feesers fails to satisfy the actual competition requirement is consistent with how the Supreme Court has interpreted other aspects of the competitive injury inquiry. The Supreme Court has interpreted the competitive injury requirement of § 2(a) to mean not "that the discriminations must in fact have harmed competition, but only that they 'may' have such an effect." *Morton Salt*, 334 U.S. at 46 (citing *Corn Products Co. v. FTC*, 324 U.S. 726, 742 (1945). However, "the use of the word 'may' was not to prohibit discriminations having '*the mere possibility*' of those consequences, but to reach those which would *probably* have the defined effect on competition." *Id.* at 46 n.14 (emphasis added). This concept applies equally to the actual competition determination. Sodexho does not sell goods or procurement services in isolation. Without more evidence to support that food costs and distribution are the determining factors, the idea that Feesers and Sodexho compete at the same functional level is nothing but a mere possibility.

Accordingly, Feesers fails to satisfy the competitive injury element of a § 2(a) claim[16] and the court will deny Feesers motion for summary judgment with respect to that claim.  The court will grant the summary judgment motions of Michael Foods and Sodexho with respect to the § 2(a) claim.

**B.**   **15 U.S.C. § 13(f)**

Because Feesers is unable to establish a § 2(a) claim, the § 2(f) claim necessarily fails.  *See Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 370 (3d Cir. 1985) (citing *Atl. & Pac. Tea Co. v. FTC*, 440 U.S. 69, 76 (1979) ("[L]iability under § 2(f) is limited to the situation where a case against a seller under § 2(a) can be established.").  Accordingly, the court will deny Feesers' motion for summary judgment and grant the summary judgment motion of Sodexho with respect to the § 2(f) claim.

**IV.**      **Conclusion**

For the foregoing reasons, the court will deny Feesers' motion for summary judgment and grant the summary judgment motions of Michael Foods and Sodexho.  An appropriate order will issue.

                                        s/Sylvia H. Rambo
                                        SYLVIA H. RAMBO
                                        United States District Judge

Dated:  May 4, 2006.

---

[16]  Because the court finds that Feesers and Sodexho were not actually competitors within the meaning of § 2(a) of the Robinson-Patman Act and, therefore, cannot establish competitive injury, the court will not reach the parties' other arguments regarding whether Feesers can establish competitive injury or whether Michael Foods has a valid meeting competition defense.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FEESERS, INC.,** | : | **CIVIL NO. 1:CV-04-0576** |
| **Plaintiff,** | : | |
| | : | **JUDGE SYLVIA H.  RAMBO** |
| **v.** | : | |
| **MICHAEL FOODS, INC. and SODEXHO, INC.,** | : | |
| **Defendants.** | : | |

# O R D E R

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT**:

1) Plaintiff Feesers, Inc.'s Motion for Summary Judgment (Doc. 128) is **DENIED**;

2) Defendant Michael Foods, Inc.'s Motion for Summary Judgment (Doc. 116) is **GRANTED**;

3) Defendant Sodhexho, Inc.'s Motion for Summary Judgment (Doc. 110) is **GRANTED**;

4) The Clerk of Court is directed to **ENTER JUDGMENT** in favor of Defendants Michael Foods, Inc. and Sodexho, Inc. and against Plaintiff Feesers, Inc.;

5) Defendant Michael Foods, Inc.'s Motion to Continue Trial Until June 26, 2006 (Doc. 195) is deemed **MOOT**;

6) Plaintiff Feesers, Inc.'s Unopposed Motion for an Amended Pretrial Order (Doc. 197) is deemed **MOOT**; and

7) The Clerk of Court is directed to close the file.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  May 4, 2006.