IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FEESERS, INC.,** | : | **CIVIL NO. 1:CV-04-0576** |
| **Plaintiff,** | : | |
| | : | **JUDGE SYLVIA H.  RAMBO** |
| **v.** | : | |
| **MICHAEL FOODS, INC. and** | : | |
| **SODEXHO, INC.,** | : | |
| **Defendants.** | : | |
| | : | |

**M E M O R A N D U M**

## I.　　Introduction

In this Robinson-Patman Act case, Plaintiff Feesers, Inc., a broad line food distributor, claims that Defendant Michael Foods discriminated against Plaintiff by offering lower prices on its egg and potato products to Defendant Sodexho, a food service management company.  Feesers charges Michael Foods with a violation of Section 2(a) of the Robinson-Patman Act for price discrimination, and Sodexho with a violation of Section 2(f) for inducing the price discrimination.

This lawsuit was initiated by Feesers on March 17, 2004.  Thereafter, the parties moved for summary judgment.  In May 2006, this court found that Feesers had established the first three elements of the prima facie case of price discrimination, but granted summary judgment to Defendants on the ground that Plaintiff had failed to offer sufficient evidence to establish competitive injury. Plaintiff appealed the adverse holding to the Third Circuit Court of Appeals, which reversed this court's holding that there was no evidence of competitive injury and

remanded the case for trial.  *See Feesers, Inc. v. Michael Foods, Inc.*, 498 F.3d 206 (3d Cir. 2007).

Over the course of three weeks in January 2008, this court held a trial and received evidence on the five issues remaining to be decided.  First, whether Plaintiff is entitled to an inference of competitive injury, the fourth element of the prima facie case of price discrimination.  Second, if Plaintiff receives an inference of competitive injury, whether Defendants have rebutted that inference by breaking the causal connection between the lower prices and any competitive injury.  Third, whether Defendants have established the affirmative defense of "meeting competition" by showing that the lower prices to Sodexho were offered to meet the equally low prices offered by Michael Foods' competitors.  Fourth, whether Plaintiff has proven that Sodexho induced price discrimination.  Finally, whether Plaintiff is entitled to equitable relief.  The following are the court's findings of facts and conclusions of law.

II.     **Prima Facie Case of Price Discrimination**

The Robinson-Patman Act was passed by Congress to respond to the issue of large chain stores utilizing their great purchasing volume to secure lower prices than their smaller competitors.  Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, provides in pertinent part:

> It shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a). Where a disfavored purchaser establishes that a price discrimination has caused lost sales or profits, competitive injury is established. However, in *Morton Salt*, the Supreme Court held that because the Robinson-Patman Act aims to prevent such injury, proof of lost sales or profits is not necessary to seek injunctive relief under the Act. *F.T.C. v. Morton Salt*, 334 U.S. 37, 49–51 (1948). Specifically, the Court recognized that a permissible inference of competitive injury may arise where a favored purchaser receives a significant discount from the price received by its competitors that endures over a substantial period of time. *Id.*

Accordingly, to establish an inference of price discrimination under the Robinson-Patman Act in the absence of lost sales or profits, a plaintiff must show: "(1) that sales were made to two different purchasers in interstate commerce; (2) that the product sold was of the same grade and quality; (3) that defendant discriminated in price as between the two purchasers; and (4) that the discrimination had a prohibited effect on competition." *Feesers, Inc. v. Michael Foods, Inc.*, 498 F.3d 206, 212 (3d Cir. 2007) (citing *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 556 (1990)).

Here, the court has already found that Plaintiff has established the first three elements of the prima facie case of price discrimination.[1] *Feesers Inc. v. Michael Foods, Inc.*, 2006 WL 1274088, at *5–8 (M.D. Pa. May 4, 2006). The only element at issue is the final one—competitive injury. The Third Circuit has instructed that:

---

[1] This holding was not challenged by any party on appeal. Accordingly, this ruling remains the law of the case. (*See* Doc. 230.)

"Competitive injury" is established prima facie by proof of "a substantial price discrimination between competing purchasers over time." In order to establish a prima facie violation of section 2(a), Feesers does not need to prove that Michael Foods' price discrimination actually harmed competition, i.e., that the discriminatory pricing caused Feesers to lose customers to Sodexho. Rather, Feesers need only prove that (a) it competed with Sodexho to sell food and (b) there was price discrimination over time by Michael Foods. This evidence gives rise to a rebuttable inference of "competitive injury" under § 2(a). The inference, if it is found to exist, would then have to be rebutted by defendants' proof that the price differential was not the reason that Feesers lost sales or profits.

*Feesers*, 498 F.3d at 213 (citing *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434–35 (1983)).

Accordingly, in order to establish a prima facie showing of price discrimination, Feesers must demonstrate by a preponderance of the evidence that (1) it was in actual competition for the same dollar with Sodexho for the sale of food to institutional customers, and (2) Michael Foods' discrimination in price between Sodexho and Feesers was substantial over time. If this burden is met, then Feesers is entitled to an inference of competitive injury. These two elements will be discussed in turn.

A.  **Actual Competition**

1.  **Legal Standard**

The Third Circuit has instructed that "[t]o determine whether Sodexho and Feesers compete to resell food products to the same group of customers '[the court] must conduct a careful analysis of each party's customers. Only if they are each directly after the same dollar are they competing.'" *Feesers*, 498 F.3d at 214 (quoting *M.C. Mfg. Co. v. Tex. Foundries, Inc.*, 517 F.2d 1059, 1068 n.20 (5th Cir. 1975)). However, Feesers need not prove that the price of Michael Foods' products was the determinative factor in any customer's decision to choose Sodexho or

4

Feesers. *Feesers*, 498 F.3d at 213–216.  Instead, in order to demonstrate actual competition for the same dollar, Feesers must show that it competes with Sodexho for the same portion of an institution's food service budget.  *Id.*

## 1. __Findings of Fact__

With this standard in mind, the court turns to the evidence presented at trial in this case.  Feesers claims that the evidence demonstrates that it competes with Sodexho to sell Michael Foods egg and potato products to certain institutional food service customers within a 200 mile radius of Harrisburg, Pennsylvania.  Defendants argue that the evidence demonstrates that Feesers and Sodexho offer two completely different services—Feesers food distribution and Sodexho food management—and that customers do not perceive the two companies to be in competition with each other.  In evaluating the evidence, the court will first discuss the distribution chain in the food service industry generally, and the roles played by the parties to this suit within that system.  Thereafter, the court will examine the customers for whose business Feesers claims that both it and Sodexho compete.  In particular, the court will focus on the decision making process that occurs when a customer decides how to purchase food, including the timing of the decision and the

factors informing it.[2]  The following are the court's factual findings, established by a preponderance of the evidence presented at trial.

## The food service industry generally

This case concerns competition for the sale of Michael Foods' egg and refrigerated potato products to institutions providing dining services.  In order to put this competition in context, a general description of food manufacturing, distribution, and institutional dining services is required.  Institutional dining services consists of meals prepared away from home.  Institutions providing dining services include colleges and universities; educational institutions such as elementary and high schools; hospitals, nursing homes, and other group living institutions; and corporations.

An institutional dining services program encompasses a number of discrete functions.  These include menu planning, procurement of food, delivery of the food, hiring and supervision of employees to prepare and serve the food, and maintenance of a kitchen and cafeteria.  Institutions have a wide range of options to accomplish these tasks.  An institution may choose to self-operate ("self-op") its dining services program and perform all dining services tasks internally.  On the other hand, an institution may choose to outsource part or all of these functions.

_____

[2] In this analysis, the court looks to the customers' decision making process not to see if price of food is a determinative factor—an inquiry the Third Circuit has held is inappropriate in assessing whether the parties are in actual competition, *see Feesers, Inc.*, 498 F.3d at 213–216—but rather to determine whether and when a customer may switch from self-op (in which food is purchased and delivered from distributors such as Feesers) to food service management (in which food is purchased from food service management companies such as Sodexho who in turn arrange for purchase and delivery by distributors).  Feesers and Sodexho are only in competition if customers have a choice between one to the other.  The customers' motivation for choosing one company over the other is relevant to determine whether the inference of price discrimination has been rebutted, *see id.* at 216, and will be discussed at length below.

When an institution makes the decision to outsource, it has essentially two options. The first is that the institution can act as a general contractor, and hire other companies to perform one or more food services tasks. The other option is that the institution may choose to hire a food service management company to act as a general contractor. In turn, the food service management company subcontracts the responsibility of providing one or more food service functions to other companies.

Regardless of how institutions choose to organize their dining services, all must purchase food (procurement) and have it delivered to the loading dock of the institution (distribution). Distribution is always performed by a distributor. However, for procurement—which in this context includes both bargaining for the price of the food, and purchasing the food—an institution has a number of options. It may procure food from distributors, or contract with a group purchasing organization (GPO) or food service management company to procure food. GPOs generally bargain for a lower price, but do not actually purchase the food for resale to institutions. On the other hand, food service management companies bargain with manufacturers for lower food prices and arrange for the purchase and delivery of that food for resale to the institution.

**The Parties**

The court now turns to the particular roles played by the parties to this case within the food service industry. Plaintiff Feesers is a broadline food distributor, carrying thousands of lines of food and food-related products from many different manufacturers. Feesers is a regional distributor based in Harrisburg, Pennsylvania, and it does most of its business within a 200 mile radius of Harrisburg, an area encompassing parts of Pennsylvania, New Jersey, Maryland,

7

Virginia, and Delaware. Feesers' customers include all segments of the food service market; however, this litigation concerns Feesers' institutional food service customers such as hospitals, schools, nursing homes, colleges, and corporations. In addition to directly distributing food to self-op food services providers, Feesers also contracts with food service management companies to deliver food to institutional food service companies that they manage.

Defendant Michael Foods is a national manufacturer of egg and refrigerated potato products. Its egg products are sold under the brand names "Papetti's" and "M.G. Waldbaum" and its refrigerated potato products under the brand name "Northern Star." Michael Foods is the largest producer of liquid eggs in the nation.

Defendant Sodexho is a multinational food service corporation headquartered in France and which does business around the world, including the five state area in which Feesers operates. As a result of recent mergers with other food service management companies including Marriott and the Wood Company,[3] Sodexho is currently both the largest food service management company and the largest private purchaser of food in the world. Sodexho's customers are large institutions across the country, including many schools, hospitals, nursing homes, corporations, and universities within Feesers' geographical zone of operation.

---

[3] At the time of the acquisition, Feesers was the primary distributor for the Wood Company. After the acquisition, Feesers continued to provide distribution for some former Wood accounts which were being managed by Sodexho. Feesers subsequently competed to be the primary distributor for Sodexho, but lost the bid to Sysco, a national distribution company which remains Sodexho's primary distributor.

## Competition between Feesers and Sodexho

As a general rule, institutions with dining services fall into two categories: self-op and managed. Feesers only sells food to self-op institutions, and Sodexho only sells food to managed institutions in conjunction with its food management services. When a self-op institution procures its food from Feesers, it generally bargains with Feesers over both the price of the food and the distribution fee for delivery of that food.[4] Alternatively, a self-op may choose to utilize the services of a GPO to bargain for a lower price. In this case, the institution purchases food from a distributor at the GPO-negotiated price plus a payment to the distributor for delivery. On the other hand, an institution managed by Sodexho contracts with Sodexho to arrange for the procurement and delivery of raw food to the institution. Sodexho then bargains for a lower food price from the manufacturer and hires a distributor to purchase food at the Sodexho-negotiated price for resale to Sodexho at that price plus a distribution fee. Sodexho in turn bills the customer for the cost of food at Sodexho's negotiated price, plus the distribution fee. Thus, a self-op institutional food service customer purchases food from a distributor such as Feesers, while a managed institution purchases the same food from a food service management company such as Sodexho.

Though it would appear that Feesers and Sodexho serve two discrete groups of customers, in fact institutional customers regularly switch from self-op to management and vice versa. Some Feesers customers have switched to Sodexho, including the Jewish Home of Greater Harrisburg and St. Mary's Catholic School.

---

[4] Sometimes an institution bargains directly with Michael Foods for a discount on the food, in a transaction referred to as a deviated billback. This transaction will be discussed in detail later.

More rarely, some Sodexho customers such as the Meadows have switched to self-op and become Feesers customers.  Both Feesers and Sodexho actively seek the business of self-op institutions.  The testimony at trial from both Feesers and Sodexho employees, as well as Sodexho's securities filings and strategic planning documents demonstrate that Sodexho seeks to convert self-op institutional customers to food service management.  Moreover, the same documents demonstrate that Sodexho has been successful in this goal.

**Sodexho Documents**

Sodexho's  internal documents also demonstrate competition with distributors such as Feesers to sell food to institutions such as schools, hospitals, nursing homes, and colleges.  For instance, in Sodexho's Form 20-F filed with the U.S. Securities and Exchange Commission Sodexho describes its competition for the business of self-ops as follows:

> Our success depends on our ability to retain and renew existing client contracts and to obtain and successfully negotiate new client contracts. . . .
> Our business and growth strategies depend in large part on the continuation of a trend in business, education, healthcare and government markets toward outsourcing services.  The decision to outsource depends upon customer perceptions that outsourcing may provide higher quality services at a lower overall cost and permit customers to focus on core business activities.  We cannot be certain that this trend will continue or not be reversed or that customers that have outsourced functions will not decide to perform these functions themselves.
> Management has also identified a trend among some of our customers towards the retention of a limited number of preferred vendors to provide all or a large part of their required services.

(Sodexho Form 20-F, P303 at 8.)  Additionally, in describing opportunities for future growth, Sodexho notes the following:

> Healthcare represents the largest potential market for Food and Facilities Management Services with outsourcing rates comparatively

low. We estimate that more than half of this market is in short-stay centers (public and private hospitals) and the remainder in long-term care facilities for the elderly and the dependent. On average, we estimate that about one third of this food service market is currently outsourced, with short-stay facilities generally more likely to outsource than long-stay facilities by a ratio of almost two-to-one.
We estimate that the education market is about one-third outsourced in food service, with about one quarter of private sector institutions and about three quarters of public institutions outsourcing food service.

(P303 at 22.)

Sodexho tracked both new self-op conversions and accounts lost back to self op in documents it referred to as "churn reports." One such churn report demonstrates that from 2000 until 2003, Sodexho gained approximately $330 million dollars in market share from self-op conversions in the hospital market, while losing approximately $142 million in accounts that converted back to self-op. (Health Care Services, Hospitals Strategic Plan, FY05–07, P160 at 40.) By contrast, competing food service management companies gained $408 million of the market in new self-op conversions while losing $253 million back to self-op. (*Id.*) Accordingly, Sodexho concludes that it "is converting self-op faster than any other single competitor, and is closing 45% of all Self-Op conversions in the market." (*Id.*) Churn reports demonstrate that institutions regularly switch back and forth between self-op and management, but that management has been gaining market share in recent years.

In addition to describing competition *for* self-ops, Sodexho repeatedly refers to competition *with* self-ops. For example, in its securities filing, Sodexho describes competition with other food service management companies, and then goes on to describe self-ops as a source of competition:

> Competition in the industry
> There is significant competition in the food and facilities management services business from local, regional, national and international companies of varying sizes, a number of which have substantial financial resources. . . . Existing or potential clients may also elect to self-operate their food or other services, or to utilize other purchasing arrangements, thereby reducing or eliminating the opportunity for us to serve them or compete for the account.

(P190 at 9.) This characterization of self-ops as a competitor also appears in Sodexho strategic planning documents assessing competition in various segments of the institutional food services industry. (*See, e.g.*, Sodexho Health Care Division Three Year Plan FY01-03, P189 at 25 (describing self-op acute care institutional customers as "an increasingly formidable competitor able to effectively replicate contractor offerings" and noting that "market dynamics and internal cultural actors cause many self-op institutions to 'think twice' before outsourcing."); Sodexho Competitive Intelligence Overview Findings, Health Care Services: Hospitals Phase I, 2003, P170 at 2 (identifying self-op as Sodexho's number one competitor).)

As noted above, Sodexho, like other food service management companies, essentially performs the function of a general contractor. When a self-op becomes a Sodexho-managed institution, it relies upon Sodexho to perform all dining services functions for which it was previously responsible, including procurement and distribution of food. Though this function is still performed by a distributor, the institutional customer does not select, contract with, or pay the distributor selected by Sodexho, as it would if the institution were self-op. Thus, when an institution switches from self-op to management, the incumbent distributor is displaced. Conversely when a managed institution switches to self-op, the functions previously performed by a food service management company, including the sale and delivery of food, are once again performed by a distributor.

Accordingly, Feesers and Sodexho compete for the same portion of an institutions' food service budget.

As Sodexho recognized in a number of strategic planning documents,

> Self-operated businesses can be expected to continue to seek the appropriate balance of cost savings, operational quality (including regulatory compliance), and patient satisfaction that meet the organization's needs and culture.
> The balance described above will be achieved with or without contractors depending upon an organization's needs and capabilities at any given time – there will be limited loyalty to outsourcing, in general, or any one contractor.
> Self-operated facilities can be expected to use contractors opportunistically – the moment value in excess of cost is not perceived (facility is now clean/in regulatory compliance, obvious cost improvements have been made, step increase in patient satisfaction has been achieved, etc.) the contracting relationship will be at risk.
> The 'Battle for Value' will intensify

(Competitive Intelligence Overview Findings, Health Care Services: Hospitals Phase I, 2003, P170 at 3; P182 at 2. ) Similar assessments appears in other Sodexho strategic planning documents for the Senior Services sector, (*see, e.g.*, P178 at 15; P166 at 4), in the Education sector, (P190 at 103 (describing self-ops as Sodexho's number one competitor).) In its Senior Services Executive Abstract Phase I: FY 03-05, Sodexho offered the following "Summary of Competitor Strategy for Self-operated institutions:

> Support services, especially food and dining services, is considered a 'core competency' and an integral part of the resident offer provided by Senior's facilities. Contractors, therefore, are perceived as taking away administrators' value and expertise. Until contractors prove that they can provide needed value to respond to new market issues, there will be little movement towards outsourcing.
> Facilities will continue to receive much of the critical expertise they require through government resources, consultants, or vendors (e.g. menus through Sysco).

(P178 at 15; *see also* Senior Services Strategic Plan FY04-06, Competitive Intelligence, P166 at 4.)

Defendants argue that the fact that the strategic planning documents do not specifically mention distributors as a competitor category demonstrates that distributors such as Feesers do not compete with Sodexho. To the contrary, it is clear that when Sodexho refers to self-op as a "competitor," it means that self-ops are able to replicate the same functions that Sodexho itself provides. This includes procurement of food from distributors such as Feesers. Thus, when Sodexho refers to self-ops as "competitors" this includes all other companies providing functions that Sodexho seeks to contract to perform, including distributors.

In response to the trend towards segmentation of functions, Sodexho explored the possibility of unbundling its services to win self-op accounts. In the Executive Abstract, Senior Services Phase I Strategic Plan FY03–05, Sodexho took note of the following "Future Opportunit[y]"

> Co-Sourcing: This concept has been in development and some testing over the past 18 months in both the former Wood and Sodexho companies. A contractual approach to 'consulting', this offer may allow us to sell our services in an 'unbundled' portfolio to Systems, as well as smaller facilities. We need to continue to energetically pursue this offer as a possible solution to penetrating the self-op market.

(P178 at 29.)

## GPOs as Competitors

Though Sodexho's strategic planning documents do not specifically mention distributors as competitors, they do discuss the competitive threat posed by GPOs, whose functions overlap with distributors. These documents shed further light on competition between Sodexho and distributors, including Feesers. GPOs negotiate with manufacturers for lower prices on behalf of their members. Additionally, GPOs may arrange for the sale and distribution of food at a discount, generally by contracting with a distributor. Thus, like distributors such as Feesers,

GPOs perform some, but not all of the functions provided by food service management companies such as Sodexho.

Distributors and food service management companies compete with GPOs for the business of institutions providing dining services.  In its strategic planning documents, Sodexho noted that "GPOs are an increasingly aggressive competitor" and warned to "[l]ook for individual GPOs to emerge as competitors in future years."  (Competitive Intelligence Overview Findings, Health Care Services: Hospitals Phase I, 2003, P170 at 2.)  Sodexho found that self-ops had an "[i]ncreasing perception that comparable or better purchasing economies can be obtained through GPOs.  Accordingly, there is an increasing number of facilities seeking/joining GPOs."  (*Id.* at 4.)

The trend continued in the following years.  In Phase I: FY 03-05 Health Care Services Strategic Plan, Sodexho describes the health care industry as "highly dynamic, challenged, and cost focused," in part due to "GPOs and e-commerce producing a commodity approach."  (P182 at 2.)  Accordingly, "as a result of these trends, health care executives will look to [Sodexho] to. . . [p]rovide products and services that deliver cost savings at acceptable quality levels or predictable cost with higher satisfaction levels."  (*Id.* at 3.)

In the Hospitals 04–05 Strategic Plan – Phase II, Strategy and Ambition, Sodexho defined the Battle for Value as follows:

> Part of our business dilemma and in fact, the whole industry's business dilemma, is that our value proposition has lost its 'edge.'  This challenge is clearly indicated by low penetration rates that haven't materially moved in years.  Under current market dynamics, our forecast is that the hospital market will not produce enough "actionable" outsourcing decisions to sustain growth for the major competitors (see sales plan).  *In general, the lines between [Sodexho], contractor capabilities, and self-operated capabilities have blurred.*

15

> *Contractors, therefore, are competing for the same small slice of a churning market resulting in a commodity mentality and a strained market.* This phenomenon has also, in effect, raised the basic 'price of admission' higher — features previously viewed by contractors as value added are now necessary base components of an expected offer. This is the "Battle For Value."

(P167 at 12 (emphasis added).)

Later, in its Health Care Services Hospitals FY05–07 Strategic Plan, Phase II, Sodexho observed the trend of increased competition with GPOs continuing:

> GPOs / E-Commerce: The growing number and complexity of GPOs combined with the emergence of e-commerce business applications in the procurement arena have, in effect, equalized the playing field enabling all entities to gain procurement leverage. Even a non-GPO aligned stand-alone facility can aggregate its buy with other facilities through E-commerce. Our historical pricing advantage is dramatically minimized. Additionally, GPOs increasingly dictate many or all aspects of the procurement process including product selection, distribution, etc.

(P160 at 16.) The implication of this trend for Sodexho Health Care Services is that "[h]istorical and clear point of differentiation will not be there for us in the future" "[i]ncreasing amount of time defending and explaining (market baskets, meetings, etc.) our prices" "[w]e are on the defensive and our credibility suffers" and "[c]ompetitors may gain access to our accounts through 'back door' purchasing relationships." (P160 at 16.)

In a summary of competitor strategy for Summary of Competitor Strategy for GPOs, Sodexho observed the following:

- GPOs will become even more aggressive and sophisticated in the analysis, pricing, and level of detail required from their preferred partners procurement programs
- Increasingly setting pricing structures to compete with and/or win market baskets
- Emergence of more GPOS that will target our high volume accounts . . .

16

- Capture all volume discount allowances possible for their members
- Require preferred partners to run all product procurement through the GPO rather than their own programs
- GPOS will increasingly act as for profit entities as they seek to add services and products for their members
- The line between alliance partner and competitor will continue to blur, and likely disappear, as GPO services and products overlap with and contradict [Sodexho's] products and services (consulting, etc.)
- Continue to improve food procurement skills
- May even begin to bid services via e-commerce
- Require partners to adhere to their program specifications (distributor, purchasing program, product specs, etc.) and impose financial penalties per contract terms for non-compliance

(P160 at 10.) Sodexho concluded: "Our primary response should be to a) re-evaluate our pricing strategy so we are competitive at the 'loading dock', . . . c) explore ways to expand Entegra's role and presence in the healthcare industry." (P160 at 10.) Sodexho's strategy to achieve dominant market share includes "Establish competitive food pricing so [Sodexho] is competitive at the loading dock versus GPO pricing structure." (P160 at 31.) In its Health Care Services Hospitals FY05–07, Strategic Plan Phase I, Sodexho acknowledged that it needed to reconsider its relationships with GPOs because "[t]he line between alliance partner and competitor will continue to blur, and likely disappear, as GPO services and products overlap with and contradict [Sodexho's] products and services (consulting, etc.)." (P161 at 50.)

This evidence demonstrates that GPOs, like distributors such as Feesers, compete with Sodexho to perform some, but not all, of the functions Sodexho offers to its customers. Institutional customers may choose to procure food from Sodexho in conjunction with its management services, or they may choose to self-op and procure food from either a GPO or a distributor such as Feesers.

17

Evidence of Sodexho's increasingly fierce competition with GPOs indicates that Feesers, Sodexho, and GPOs are all competing for business of the same group of institutional customers.

**Entegra**

One response by Sodexho to increasing segmentation of functions in the food service industry was to develop its own GPO, Entegra, to provide food service procurement unbundled from the distribution and management services typically provided by Sodexho. Entegra is a wholly owned subsidiary of Sodexho, and it has access to Sodexho deviated pricing. Entegra is not a defendant to this action, but its strategic planning documents shed light on competition between Feesers and Sodexho by offering further evidence of the increasing segmentation in the institutional dining services market and the increasing interest of institutions in saving money by lowering food prices.

In a strategic planning document, Entegra describes the Health Care and Senior Services market as follows:

> Heath Care and Senior Services will be dominated by a few key GPO's . . . these health care GPO giants will lose market share as large systems opt to self-contract. In response, the GPO's will seek to maintain their profits by spilling over into the schools and campus markets where they will take hold over the next two to three years. They will find a responsive customer due to strong plays by Sysco and US Foodservice [both broadline distributors] to increase their margins in the wake of waning national competition.

(Entegra's Three-Year Plan, FY2005-2007, Phase I, P163 at 4.) Further in the same document, Entegra describes a trend towards segmentation of procurement and food service management: "It is becoming increasingly more common that health care systems will look at procurement and management as two different functions . . . Some customers are going a step further and looking at distributor and manufacturer

relationships as two different functions to be outsourced." (*Id.* at 19.) Entegra

summarized the risks and opportunities of this trend as follows:

> There is an increasing tendency of systems in health care to look at procurement as a separate function from the management services Sodexho provides. . . This can lead to further utilization of entegra with a resulting erosion in margins. We will need to compete for this procurement business in order to continue to have access to our contracted products. . .
> As systems pull back from GPO relationships they will look for providers such as Sodexho to offer services that address the needs of all of their facilities—management for some, procurement for others, co-sourcing for yet others. This can be a risk and an opportunity. . .
> It is likely that current entegra clients will bid distribution and procurement services as two different activities in the future. . . . We expect that many will negotiate their own distribution agreements and look for a third party to provide manufacturer agreements.

(P163 at 20.)

The Entegra Procurement Services Three Year Plan FY 2005–2007,

Phase II supports this trend:

> Opportunities, Risks & New Business – Risks continue to be in the area of pricing competitiveness and the spread of group purchasing organizations. While pricing competitiveness is a challenge for entegra from a sales and retention perspective it is increasingly becoming an issue for the retention of purchasing in Sodexho-managed business. Due to this, entegra is being considered more frequently as an option for Sodexho business.

(P159 at 6.) Entegra continued to observe the market trend towards segmentation:

> It is becoming increasingly more common that health care systems will look at procurement and management as two different functions . . .
> Some customers are going a step further and looking at distributor and manufacturer relationships as two different functions to be outsourced.

(*Id.* at 12.) "A strong systems offer that includes management services for select

sites and procurement services for others can be a strong retention activity with

existing clients or a lead-in with a potential client." (*Id.* at 13.)

## Timing of Competition

Defendants argue that regardless of the evidence that Feesers and Sodexho compete for the same institutional customers, they are not in actual competition for any one customer because Sodexho typically competes only in a formal bidding process in which distributors such as Feesers do not participate. However, contrary to Defendant's assertions, the evidence presented at trial demonstrates that competition occurs not just in the formal request for proposal ("RFP") process, but also on an informal basis all the time. Sodexho sales employees regularly make informal contacts with targeted institutions, some of which are Feesers customers.

As a general matter, Defendants are correct that the evidence demonstrates that most self-op institutions engage in a formal RFP process prior to signing a contract with a food service management company. The RFP process generally only includes food service management companies such as Sodexho, Compass, and Aramark. Depending on the size and type of institution, the RFP process may be extremely detailed and lengthy and include bids on a wide range of services not provided by distributors. However, not every RFP process concludes with a contract with a food service management company. As Sodexho noted in a strategic planning document, sometimes "Self-Ops use contractors to 'fix' current problems and then return to self-op or use the RFP process to gain ideas but remain in-house." (P190 at 19.)

Additionally, Sodexho competes with distributors such as Feesers outside of the formal RFP process. Jay Marvin, Sodexho's Senior Vice President for Sales and Marketing for the Health Care Division, described how Sodexho seeks to

acquire a new client.  For self-ops, Sodexho first identifies institutions that meet its client profile (generally larger institutions).  Sodexho sales team then makes contacts and forms relationships at the institution.  The team gauges the institution's interest in management and determines whether there are any particular problems to be solved.  If the institution is interested in management, then it puts out an RFP. The RFP process for hospitals is usually quite lengthy and formal, and generally only involves other food service management companies such as Aramark and Compass.  The process can be less formal with senior services institutions, but a proposal is still generally required.

Moreover, in some cases, Sodexho's proposals themselves demonstrate direct competition with distributors.  This can occur when a self-op institution chooses to utilize Sodexho management services while retaining distributors for some or all food procurement.  For instance, in a proposal to the Beth Sholom Home of Eastern Virginia, Sodexho urged the institution, which was already a Sodexho customer, to utilize Sodexho's procurement program as well:

> Purchasing Program
> Utilization of the Sodexho purchasing program provides great financial benefits to our partner facilities.  As the industry leader in food procurement with purchasing responsibility for approximately 5,300 facilities throughout the United States, Sodexho is able to purchase food at pricing that is not able to be realized by smaller organizations.
>
> Currently the full resources of the Sodexho procurement program are not being utilized.  A significant portion of the department purchasing is done utilizing US Foodservice [a broadline food distributor].  It is our recommendation that Beth Sholom Home of Eastern Virginia take full advantage of the kosher procurement program and pricing afforded by its partnership with Sodexho.  Use of the Sodexho kosher vendors would not only streamline the ordering process but would substantially reduce pricing, specifically in the kosher poultry market.

(P77 at 2.)

## Customer Testimony

Defendants also called ten customer witnesses who testified unanimously that they did not perceive Feesers to be a competitor with Sodexho.[5] However, the court does not infer from this testimony that Feesers is not in competition with Sodexho for the sale of food to institutional customers for a number of reasons. It appeared that the witnesses believed that two companies are competitors only if they offer precisely the same set of services. At least one witness (Shippensburg) was under the impression that Feesers was seeking the opportunity to bid against Sodexho in the RFP process. Many other institutions had already committed to either self-op or management at the time they were considering either Feesers or Sodexho, and accordingly their choices were limited to either distributors or management companies.

No testimony was presented by any witness for an institution that was considering a switch from self-op to management, or vice versa. However, it is clear from Sodexho's own internal documents that many institutions do regularly switch from self-op to management. Thus, the court cannot infer from the testimony of the ten customer witnesses who were not considering such a switch that no customer ever does consider such a switch. Accordingly, the court gives no weight to the conclusions of the ten customer witnesses that Feesers does not compete with Sodexho.

---

[5] The customer testimony will be addressed in greater detail when addressing Defendants' attempt to rebut the inference of competitive injury.

3.    **Conclusions of Law**

Based on the above findings of fact, the court concludes that Feesers and Sodexho are in actual competition for the same dollar in the sale of Michael Foods products to institutional customers within Feeser's geographical zone of operation.  Feesers and Sodexho both compete to sell Michael Foods egg and refrigerated potato products to the same institutional customers.  The court will take this opportunity to address a few of Defendants' arguments on this point.

First, Defendants argue that Feesers competes only with other distributors such as Sysco, rather than food service management companies such as Sodexho.  In support of this argument, Defendants point out that Sodexho has no delivery trucks or warehouses, and does not directly perform distribution for its clients.  However, the fact that Sodexho chooses to subcontract the physical delivery of food to a distributor (generally Sysco) rather than perform this function itself is of no significance in determining whether Sodexho competes with Feesers.  From the perspective of the institutional customer, that customer contracts with Sodexho to provide food and distribution, notwithstanding the fact that Sodexho in turn contracts with a distributor to perform the function.  Thus, Sodexho competes with distributors in the sale of food and distribution to institutional food service customers.  The Supreme Court has repeatedly stated that the Robinson-Patman Act should not be construed in a way that "would allow price discriminators to avoid the sanctions of the Act by the simple expedient of adding an additional link in the supply chain."  *Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 647 (1969); *accord Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 567 n.26 (1990) (applying same principle to similar facts).

It is also not significant that Feesers and Sodexho have never simultaneously submitted an RFP to the same customer at the same time. As noted above, the evidence presented at trial demonstrates that competition in the industry is not confined to the formal RFP bidding process. For instance, Sodexho sales employees testified that they solicit the business of self-op facilities that have never before considered food service management. Additionally, the evidence established that some customers initiate the RFP process in order to gain ideas for how to improve their food service programs, but ultimately decide to remain self-op. Other customers utilize food service consultants to submit a self-op bid in the RFP process. Finally, some customers hire a food service management company to correct problems with their food service programs, only to return when the problems are fixed. In this competitive environment, the fact that no distributor has ever submitted a proposal in a food service management RFP process does not establish that distribution companies are not in competition with food service management companies for those accounts. Instead the evidence demonstrates that competition occurs when a customer considers switching from self-op to food service management, or vice versa. Although the customer's decision may be influenced by the RFP process, competition for an account is not confined to the process.

Defendants cite *Volvo Trucks North Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164 (2006), in support of their claim that Feesers was not in competition with Sodexho for the sale of Michael Foods products. In *Volvo Trucks*, the Court held that a truck manufacturer did not violate the Robinson-Patman Act by offering different discounts to dealers submitting bids for custom-made trucks to customers because there was no actual competition between the dealers for the same

customers. In reaching this conclusion, the Court carefully examined the competitive process for the sale of custom-made trucks. The record revealed that customers purchased custom-made trucks through a competitive bidding process. Customers solicited bids from numerous dealerships selling different brands of trucks, but because Volvo dealers generally operated in separate geographic zones, customers rarely submitted simultaneous bids from two different Volvo dealers at the same time. In preparing a bid, Volvo dealers often requested a discount from Volvo. In the rare instance that two Volvo dealers were submitting a bid to the same customer, Volvo's policy was to offer the same discount to both dealers. Reeder-Simco complained that other dealers received steeper discounts from Volvo, but the Court held that this was an inappropriate comparison to make because those sales involved only other non-Volvo dealers. In other words, because the competitive process for the sale of custom-made trucks was formal and limited to only a handful of dealers, Reeder-Simco was not in actual competition with other Volvo dealers in transactions in which it did not submit a bid. The Court acknowledged that Reeder-Simco competed with other Volvo dealers for the *opportunity* to bid on sales, but noted that at this stage in the competition, no dealership had secured any discount from Volvo that they could use to gain a competitive advantage over other Volvo dealers. *Id.* at 178–179. Accordingly, the Court concluded that the discounts received by other Volvo dealers during the course of any bidding process in which Reeder-Simco did not bid did not result in competitive injury to Reeder-Simco. *Id.* at 179.

*Volvo Trucks* teaches that in order to determine whether two purchasers are in actual competition, a court must carefully examine both the competitive

process and the customers. Defendants attempt to draw an analogy between *Volvo Trucks* and the facts of this case, claiming that the competitive process for the sale of Michael Foods products is narrowly confined to the RFP process, in which Feesers and other distributors do not directly participate. However, as noted above, the court rejects Defendants' narrow view of competition in this case. The evidence presented at trial establishes that competition for the sale of Michael Foods egg and potato products to institutional food service customers was ongoing and not limited to the formal RFP process. Food service management companies, distributors, and GPOs all compete formally and informally for the sale of food to institutions. Even when a company initiates the RFP bidding process, which includes only food service management companies, that choice is not final or limited to the companies submitting a bid. *Volvo Trucks* is not controlling because competition in this case is much broader than that at issue in that case. Unlike *Volvo Trucks*, the fact that Feesers does not participate in head-to-head bidding against Sodexho in a formal RFP process does not demonstrate that Feesers does not compete with Sodexho for the sale of Michael Foods products to those customers.

## B.   Substantial Price Discrimination Over Time

### 1.         Legal Standard

In order to pose a risk of injury to competition, there must be substantial price discrimination over time. "The presumption of the requisite adverse competitive effects contemplated by section 2(a) is most likely to arise when the price differential is (1) substantial enough to influence a disfavored customer's resale price; or (2) occurs in a market with low profit margins and intensive competitive conditions." *J.F. Feeser v. Serv-A-Portion*, 909 F.2d 1524, 1538 (3d

26

Cir. 1990) (internal citations omitted).  Temporary or trivial price differences are not normally enough to risk an injury to a disfavored competitor.  However, the longer the discount is offered and the greater magnitude the price difference, the more likely it is that the price discrimination will cause an injury to competition.

2.      **Findings of Fact**

The evidence presented at trial establishes that Michael Foods discriminated in price in favor of Sodexho and against Feesers in the sale of egg and potato products to a sufficient degree and duration to entitle Feesers to an inference of competitive injury.  The court will now review the evidence of price discrimination presented at trial and briefly respond to Defendants' criticisms of that evidence.

**Michael Foods Pricing**

Michael Foods generally sells its products to distributors at list price. For egg products, Michael Foods' list price applies nationally.  Because competition for potato products varies by region due to competition by relatively small regional potato product manufacturers, Michael Foods has different pricing arrangements based on region for its potato products.  However, one list price applies to distributors competing within the same geographical region for the sale of Michael Foods potato products.

Until the mid-1990s, all distributors purchased food at the national list price from manufacturers, including Michael Foods.  In the 1990s, some large institutions began negotiating directly with manufacturers for discounts, or deviations from the list price, in exchange for guarantees of minimum purchases. Such transactions proceed as follows:  First, a distributor purchases the product at

list price from the manufacturer.  The product is purchased at list price because at the time of purchase, the product is destined for the distributor's warehouse, and has not yet been allocated to a particular customer.  Next, the distributor sells the product to the designated customer at the deviated price plus a distribution markup separately negotiated by the customer.  Finally, the distributor bills the manufacturer for the difference between the list price and the deviated price after presenting proof that the product was delivered to the customer who negotiated the deviated price.

Today, sixty percent of purchases from Michael Foods are made at deviated, rather than list price, according to Mark Westphal, CFO for Michael Foods.  More large self-op institutions are negotiating directly with manufacturers. Institutions may contact manufacturers directly, or ask a distributor to assist it in securing deviated pricing.  Such deviated pricing is institution-specific.  In other words, a distributor may only acquire goods at the deviated price that will be sold to institutions which have secured a deviated price.  This means that the institution may choose another distributor or even food service management, and still enjoy the lower price it negotiated.  Though institution-specific deviated pricing results in lower pricing to some institutions, the lower pricing is unlikely to cause competitive injury because most institutions such as schools, hospitals, and nursing homes do not compete with other institutions on the basis of food costs.

In recent years, Michael Foods has extended deviated pricing to food service management companies, including Sodexho.  Unlike the deviated pricing described above, Sodexho deviated pricing is not institution-specific.  Instead, it applies to every institution that Sodexho manages.  Accordingly, Sodexho can use its low deviated price both to win new accounts and to keep current customers.

However, if a customer switches from Sodexho to either self-op or another food service management company, it loses the benefit of the lower Sodexho prices for food purchases.

In addition to deviated pricing, Michael Foods grants a number of other types of discounts. These include volume discount allowances, preferred supplier allowances, marketing allowances, blanket bid allowances, local allowances, and UniPro rebates. These discounts may be granted to either distributors like Feesers or food service management companies such as Sodexho. A volume discount allowance is a price reduction based upon the volume of a customer's purchases. A preferred supplier allowance is essentially a signing bonus for designating Michael Foods as a primary supplier of a food product. Marketing allowances are a type of discount offered for certain products temporarily in exchange for the promotion of those products for resale to customers. For instance, Michael Foods grants marketing allowances to customers who attend a food show promoting Michael Foods food products. Blanket bid allowances are discounts that apply to certain categories of customers, such as nonprofits or schools. Michael Foods also grants discounts to members of UniPro, a GPO. Essentially there are three types of UniPro discounts: (1) product-specific, volume-based rebates granted to UniPro based on the purchases of all UniPro members; (2) annual UniPro rebates to support marketing efforts; and (3) the UniPro tier growth program.

**Magnitude of Price Discrimination**

Having surveyed and briefly described Michael Foods' general pricing arrangements, the court now turns to the specific discounts received by Sodexho and Feesers respectively, and the competitive impact of these discounts. To

establish the magnitude of the price discrimination at issue in this case, Feesers presented expert testimony and other evidence from economist Dr. Robert Larner. Defendants did not present any rebuttal expert testimony, choosing instead to rely on its cross examination of Dr. Larner and testimony by Michael Foods CFO Mark Westphal. After hearing Dr. Larner's testimony and reviewing the evidence, the court finds Dr. Larner's methodology appropriate and reliable, and his findings well supported by the evidence. The court will now briefly describe Dr. Larner's study and his conclusions, and address Defendants' criticisms of that study.

Dr. Larner examined sales data from Michael Foods, Sysco (Sodexho's primary distributor for much of the time in question), Sodexho, and Feesers from 2000 until 2004. Using that data, he compared the Sodexho deviated price (referred to by Dr. Larner as the "Sodexho delivered price")[6] for Michael Foods products with that paid by Feesers. His findings are presented in a series of charts attached to his June 13, 2005 expert report (hereinafter referred to as the "Larner Report"), and demonstrative exhibits, which were all admitted into evidence at trial.

First, Dr. Larner determined the baseline prices secured by Sodexho and Feesers respectively for the eleven Michael Foods egg and potato products most commonly purchased by Feesers. Collectively these nine egg and two potato products constitute over eighty percent of Michael Foods' total sales to Feesers. Dr.

---

[6] The Sodexho deviated price is the price bargained for by Sodexho and received by Sodexho's approved distributor (Sysco) for Michael Foods products that are resold to Sodexho. As discussed above, in this deviated billback transaction, Sysco initially pays the Michael Foods list price for these products, then sells them to Sodexho for the deviated price plus a separately negotiated distribution markup. Sysco then bills back Michael Foods for the difference between the list price and the Sodexho deviated price. By contrast, Feesers pays the distributor list price. Defendants dispute whether the Sodexho delivered price is the appropriate price for comparison. This argument will be discussed below.

Larner then determined the Sodexho deviated price and the price paid by Feesers for the sale of Michael Foods products.  To establish the Sodexho deviated price for each item, Larner started by examining the supply agreements between Sodexho and Michael Foods.  For Sodexho, Larner found that the prices paid were the same as described in the supply agreements.  Because Feesers has no supply agreements with Michael Foods, Larner looked at Michael Foods' list prices to determine the price paid by Feesers for the same products.  As a member of the distributor GPO UniPro,[7] Feesers received the prices set forth on Michael Food's distributor buying group price list.  Finally, Larner examined the transaction prices at which Michael Foods sold products to Feesers and Sodexho.  For Sodexho, Larner found this information in Sysco's database of deviated sales data.  For Feesers, this information was contained in Feeser's accounts payable database.  Larner found that the prices reflected in these three sources of data were consistent, and accordingly in his analysis he compared the prices reflected in Sodexho's contract pricing documents with those in Feeser's accounts payable database.

Next Dr. Larner compared the Sodexho deviated price to the price paid by Feesers to Michael Foods.  Dr. Larner's findings are presented in a series of tables attached as exhibits to his report, and in demonstrative exhibits presented at trial.  In these tables, for each of the eleven top-selling Michael Foods products Larner compares the average monthly purchase price paid by Feesers with the Sodexho delivered price for the same product.  These charts account for product-

---

[7] Defendants introduced evidence of Feesers' receipt of discounts from Michael Foods for two purposes: (1) to demonstrate that the discrimination in favor of Sodexho was not substantial, and (2) to show that Feesers should not receive the injunctive relief it seeks because Feesers has "unclean hands" due to its receipt of customer-specific deviated pricing and UniPro discounts.  The former argument is addressed here, and the latter is discussed below.

specific deviated prices only, and do not include the non-product-specific preferred supplier and volume allowances, which are presented separately in Exhibit D-13. The prices listed are the average prices paid by both Feesers and Sodexho weighted by volume for each month. The tables present the price difference both in dollar and percentage terms.

The price difference Dr. Larner found is stunning. For example, in Exhibit D-1, Larner compared the pricing for table ready eggs (MF 15222), which was Michael Foods' top selling product to Feesers, accounting for 28.4% of Michael Foods' total sales to Feesers from 2000 until 2004. The average weighted monthly average price paid by Feesers for this product was $12.04 higher than the price received by Sodexho, and on average, Feesers paid 67.8% more for this product than Sodexho paid for the same product at the same time. Dr. Larner found similar differences for the next ten top selling Michael Foods products. (*See* Larner Expert Report, Exs. D-2–D-11.) Altogether, Dr. Larner found that on average from 2000 until 2004,[8] Feesers paid $9.56, or 59.% more than Sodexho for the eleven top selling Michael Foods products taken together. (*Id.* Ex. D-12.)

Moreover, this price disparity does not account for the non-product-specific discounts and allowances granted by Michael Foods, which Dr. Larner summarizes in Exhibit D-13 of his report. These discounts fall within three categories: marketing allowances, a preferred supplier allowance, and a volume growth incentive allowance. The chart reflects that both Feesers and Sodexho received some modest discounts for marketing allowances during the years in

_____

[8] It should be noted that Michael Foods did not supply potatoes to Sodexho until 2002. Accordingly, in making this calculation, Dr. Larner used the weighted monthly average prices for potato products from 2002 until 2004 only.

question.  Feesers received a slightly higher discount than Sodexho for marketing allowances, at $.04/lb with a minimum purchase requirement, as compared with Sodexho's $.10/case ($.005/lb for a 15 lb case).  However, the marketing allowance is not a pure volume discount because it requires the recipient to expend some funds and effort in marketing the product in order to be eligible.

On the other hand, Sodexho alone received the preferred supplier and volume growth incentive allowances.  These discounts were in exchange for a minimum volume commitment of approximately 76 million pounds of Michael Foods egg products annually, and for designating Michael Foods as the preferred supplier of eggs and potatoes for Sodexho.  (*See* 2002 Egg Contract between Sodexho and Michael Foods, P7 ¶ 3.)  For the preferred supplier allowance for eggs, Sodexho received lump sum payments from Michael Foods totaling $2.2 million for the 1999 and 2002 egg contracts, as well as a retroactive allowance of $137,493 in 2002.  (*See* Larner Report Ex. D-13; 2002 Egg Supply Contract between Sodexho and Michael Foods, P7.)  For the 2002 potato contract, Sodexho received a total payment of $75,000 paid in lump sums of $25,000 a year from 2002 through 2004. (*Id.*)  For the volume growth incentive allowance, Sodexho received a discount per pound for volume growth in sales over and above those of the previous year.  (*Id.*) For example, if Sodexho sold ten percent more egg products than the previous year, it would receive a payment of $.01/lb for those sales over and above the baseline. These two allowances were paid directly to Sodexho, rather than its distributor Sysco, and Feesers received no such discounts from Michael Foods.

Although not included the weighted monthly average prices, Dr. Larner also calculated Feesers' product-specific UniPro rebates and Sodexho's product-

specific allowances in comparing the prices for Michael Foods' egg products. (*See id.* Exs. D-1–D-9, columns 5 and 6.) The UniPro rebates and allowances received by Feesers are dwarfed by Sodexho's price advantage for these products. For instance, in the sale of Michael Foods' table ready eggs, Feesers received a UniPro rebate of $1.20/case from 2000 until October 2002, when the discount increased to $1.28/case. (Ex. D-1, columns 5 and 6.) On the other hand, Sodexho received a product-specific allowance for the same product in the amount of $.90/case from 2000 until 2002, when the allowance increased to $1.20/case. However, although Feesers received a slightly larger product-specific rebate than Sodexho for this product (at most $.30/case more than Sodexho), the Sodexho delivered price for the same product ranged from $8.70/case to $12.15/case less than the price paid by Feesers during the same time period. (*See id.* Exs. D-2–D-9, columns 5 and 6.)

It must be noted that Dr. Larner's calculations do not take into account the deviated pricing that Feesers receives in certain transactions. Feesers purchases some Michael Foods products at deviated prices as distributor for certain institutions and food service management companies. For instance, Feesers received deviated pricing as prime distributor for the Wood Company, and later briefly for Sodexho after Sodexho acquired Wood. However, Feesers' receipt of deviated pricing restricted to a particular food service management company cannot be used by Feesers to compete with that company for customers. Accordingly, it would be inappropriate to consider these restricted deviated prices when determining whether Sodexho's discount is substantial enough to cause competitive injury to Feesers.

The Sodexho deviated pricing is passed directly to customers, while the preferred supplier and volume growth incentive allowances are retained by Sodexho at the corporate level. However, there is evidence that Sodexho passes these benefits to customers indirectly, in the form of financial guarantees, interest free renovation loans, or for some customers, cash signing bonuses. For instance, the following language appears in a Sodexho proposal to Lehigh University:

> While our purchasing practices assure all units receive products and services at competitive pricing, Sodexho also negotiates corporate discounts and rebates that are realized at the corporate level. Prompt payment discounts and other rebates or allowances obtained from vendors supplies, or distribution companies, including those obtained through our national and regional purchasing arrangements based on Sodexho's total purchases, are retained a the corporate level. For example, meeting volume commitments on a national basis may result in a negotiated rebate for achieving this volume level, and those rebates are paid to Sodexho on a national basis, and are not realized at the account level. *Maximizing these opportunities allows Sodexho to offset corporate overhead expense and ultimately affords the opportunity to offer our customers, such as Lehigh University, financially viable and competitive agreements.*

(Sodexho Proposal to Lehigh University, P95 at 62–63 (emphasis added).)

## Defendants' Criticism of Dr. Larner

Defendants challenge Dr. Larner's calculations on a number of grounds. Defendants chose not to present any expert testimony in rebuttal by their own expert economist. Instead, Defendants attacked Dr. Larner's analysis on cross examination and presented testimony by Michael Foods CFO Mark Westphal concerning Feesers' use of deviated pricing for certain customers. These criticisms and evidence will be addressed in turn.

Defendants argue that Dr. Larner should have compared the Sodexho deviated price plus Sysco's markup with the price paid by Feesers rather than the Sodexho deviated price alone, which is paid by Sysco. This argument fails for two

reasons.  First, Dr. Larner argues convincingly that price discrimination should be compared at the level at which it occurs, which in this case is at the initial transaction between Michael Foods and Sysco for the sale of goods at the Sodexho deviated price.  While Sodexho negotiates directly with Michael Foods for the sale of food, Michael Foods does not sell its products directly to Sodexho, but rather sells them to Sodexho's designated distributor, usually Sysco.  However, this additional link in the supply chain is more form than function.  After all, in its contracts with customers Sodexho assumes contractual responsibility for the procurement and distribution of food, and it negotiates directly with the manufacturer for a lower price on that food.  In this case, although Sysco performs the role of a distributor—a role that was formerly performed by Feesers under the Wood contract—it does not perform the same function as a distributor serving a self-op.  In serving Sodexho, Sysco does not negotiate a price for the sale of food to Sodexho, or to Sodexho's customer.  In any event, the deviated pricing is passed on directly to customers, who are invoiced by Sodexho for the cost of food.  The cost of food consists of the Sodexho-delivered price plus a markup for distribution.  The distribution markup is separately negotiated by Sodexho.

Second , Dr. Larner did an additional analysis comparing the price paid by Feesers with the Sodexho price plus the Sysco markup.  This comparison appears in the E-series of tables in Dr. Larner's expert report.  While this comparison slightly reduces the price disparity, it does not eliminate it.  For example, when Sysco's distribution markup is considered, the price disparity in the sale of Michael

Foods table-ready eggs is reduced from an average of 67.8% (Exhibit D-1) to 44.6% (Exhibit E-1).[9]

The court also rejects Defendants' argument that Dr. Larner's calculations fail to account for the allowances received by UniPro. This is incorrect. Dr. Larner's analysis clearly compared the UniPro rebates with the allowances secured by Sodexho in his calculations in Exhibits D-1 through D-9. Furthermore, these modest discounts scarcely compare with the massive disparity between the Sodexho deviated price and the unrestricted national distributor list price paid by Feesers.

Defendants also argue that Feesers was the beneficiary of deviated prices for specific customers, and that Dr. Larner inappropriately failed to include these deviated prices in his calculations. Mark Westphal testified that from 2000 until 2003, 77% of Feesers purchases were made at deviated prices. Michael Foods also submitted contracts for 44 separate customers who received deviated pricing and designated Feesers as the sole distributor eligible to receive such deviated pricing. However, each and every one of these price deviations was customer specific, and could not be used by Feesers to win or retain an account.

Moreover, even if the Sodexho deviated prices had been compared with the deviated prices secured by self-op institutions and other food service management companies served by Feesers, this would not alter the court's conclusion. On cross examination, Westphal admitted that none of these restricted deviated prices were nearly as great as the Sodexho deviated price. For instance,

_____

[9] The court further notes that this is an inappropriate comparison because it does not take into account the distribution costs to Feesers associated with delivering the goods to its customers.

Westphal testified that the Swarthmore deviated price for Michael Foods egg products was $.725/lb as compared with Sodexho's deviated price of $.58/lb, a significant price disparity. When asked by Feesers' counsel, Westphal was unable to recall any institution that received a deviated price within $.10/lb of the Sodexho deviated price. There is a good explanation for this. In 2002, Sodexho secured a "most favored nation" clause in its egg contract, guaranteeing that no one would get a lower price than Sodexho for Michael Foods egg products. (2002 Egg Supply Contract between Sodexho and Michael Foods, P7 ¶ 5(b).)

Finally, the court rejects Defendants' argument that Sodexho-level prices were made available to Feesers. Before commencing this litigation, Feesers requested Sodexho-level deviated pricing from Michael Foods. Michael Foods agreed to the lower price only where Feesers demonstrated that it was seeking to win the account of a current Sodexho customer. Michael Foods' offer of Sodexho pricing to Feesers does not mean that the Sodexho discounts were practically available to Feesers in order to compete with Sodexho. Michael Foods offered to provide Sodexho level pricing to Feesers only upon proof that a customer was a current Sodexho customer. The problem is that Michael Foods' offer only addressed one part of competition—Feesers' attempts to win over Sodexho accounts. It does not address Sodexho's attempts to convert Feesers' self-op customers to Sodexho management. Feesers has no way of knowing when Sodexho is trying to lure its customers away—as noted above, competition in this industry is not narrowly confined to the formal RFP process, and Sodexho may spend years cultivating potential customers before convincing them to consider making a switch. Accordingly, Michael Foods' limited offer of deviated prices for Feesers to

38

compete with Sodexho customers did not make Sodexho's deviated prices available to Feesers as a practical matter.

**Substantiality of Price Discrimination**

Having determined the level of price discrimination, the court must decide whether the price disparity was substantial. Whether a price discrimination is substantial depends on the particular industry and customers. The more price sensitive the industry, the more likely it is that even a small difference in price is substantial enough to cause competitive injury. Here, the evidence demonstrates that the food service industry is extremely price sensitive and populated by increasingly sophisticated and budget-conscious institutional customers. Three categories of evidence are particularly relevant: Sodexho's strategic planning and marketing documents, customer testimony, and expert opinion testimony by Dr. Larner.

Sodexho's strategic planning documents emphasize the importance of price in winning over new contracts. For example, in Phase I: FY 03-05 Health Care Services Strategic Plan, Sodexho predicted that "[o]ur client will seek a series of products and services which produce cost savings at acceptable quality levels . . . We will have to organize and allocate resources to the development of money saving products and services. . . Clients may demand to see pricing on a line item basis for ease of price/vendor comparison." (P182 at 5.)

Jay Marvin testified that GPOs typically serve self-op clients, and had a strong participation among acute care hospitals. As noted above, GPOs are an alternative to the use of a distributor for self-op institutions. Because of GPO pressure, Sodexho was increasingly concerned about market baskets and other line

by line price comparisons requested by customers. (*Id*. at 16.) The health care strategic plan noted the following GPOs / E-commerce industry trends:

> GPOs / E-Commerce: The growing number and complexity of GPOs combined with the emergence of e-commerce business applications in the procurement arena have, in effect, equalized the playing field enabling all entities to gain procurement leverage. Even a non-GPO aligned stand-alone facility can aggregate its buy with other facilities through E-commerce. Our historical pricing advantage is dramatically minimized. Additionally, GPOs increasingly dictate many or all aspects of the procurement process including product selection, distribution, etc.

(P182 at 16.) The implications of this trend for Sodexho Senior Services are that: "[h]istorical and clear point of differentiation will not be there for us in the future" "[i]ncreasing amount of time defending and explaining (market baskets, meetings, etc.) our prices" "[w]e are on the defensive and our credibility suffers" "Competitors may gain access to our accounts through 'back door' purchasing relationships." (P182 at 16.) Likewise, in the Health Care Services Hospitals FY05–07 Strategic Plan, Phase II, Sodexho observed that "[t]he need to continually demonstrate incremental value will intensify." (P160 at 6.) Sodexho concluded that "[o]ur primary response should be to a) re-evaluate our pricing strategy so we are competitive at the 'loading dock', . . . c) explore way to expand Entegra's role and presence in the healthcare industry." (*Id.* at 10.)

One of Sodexho's "Key Initiatives" was a "Purchasing Improvement Plan" with the objective "to maximize Gross Profit Margin and to maximize our GPO & Strategic Business partnerships while attempting to address the growing issues surrounding our uncompetitive market basket results in the field." (P160 at 23.) This initiative included the creation of a "Competitiveness Task Force to address food cost competitiveness in the field, addressing issues of maintaining the

balance between food cost and VDA [volume discount allowance] income. . ." (P160 at 23.)  In the Health Care Division Three Year Plan for 2001–2003, Sodexho declared that [t]he Health Care Division will focus on the following major initiatives for the Acute Care segment:  Develop a low-cost food offering designed to reduce costs by a minimum of 10%."  (P189 at 46.)

The significance of food costs is also demonstrated by the participation of some customers in the U.S. Department of Agriculture's Net Off Invoice ("NOI") commodity program.  The NOI program allows school districts to obtain certain processed foods at a discount subsidized by the government.  However, the NOI program can only be utilized by authorized distributors, *see* 7 C.F.R. §§ 250.12, 250.3, and Sodexho's primary distributor Sysco was ineligible.  Accordingly, some Sodexho customers have chosen to utilize Feesers for NOI purchases.  This evidence further supports the conclusion that schools are extremely sensitive to small price differences.

Finally, at trial Dr. Larner offered his expert opinion that the price discrimination in favor of Sodexho was substantial enough to cause competitive injury to Feesers.  Dr. Larner testified that the food service industry is characterized by intense competition and tight profit margins, and he concluded that the price discrimination in favor of Sodexho that he found in his expert report was substantial enough to cause competitive injury to Feesers.

Defendants dispute Dr. Larner's conclusion that the price differences noted above were substantial.  Defendants argue that Dr. Larner should have performed a quantitative analysis to determine the price sensitivity of customers in the food service industry, isolating price from other factors customers consider.  On

cross examination, Dr. Larner conceded that such an analysis could be performed. The court is satisfied that such a study is not necessary. Defendants further argue that Larner failed to separate the effects of deviated pricing for Michael Foods products from the deviated pricing Sodexho receives from other manufacturers. However, it is well settled that where the price discrimination at issue affects only a small number of articles sold, the Robinson-Patman Act still applies. *See F.T.C. v. Morton Salt*, 334 U.S. 37, 49 (1948). The court credits Dr. Larner's expert opinion that the price discrimination in favor of Sodexho was so substantial and sustained that Feesers is entitled to an inference of competitive injury.

In sum, the court finds that Michael Foods has engaged in substantial price discrimination in favor of Sodexho. Sodexho has received significant and long-term price discounts from Michael Foods, including the lowest deviated prices offered by Michael Foods. Although Feesers also received certain discounts by virtue of its membership in UniPro, these discounts are dwarfed by those granted to Sodexho. Additionally, Sodexho alone received large signing bonuses and volume based discounts. Though these discounts were not passed on to customers directly, they were used to provide other benefits to customers, a selling point to win and retain customers.

### 3.        **Conclusions of Law**

Based on the evidence presented at trial, the court concludes that Feesers has established by a preponderance of the evidence that Michael Foods discriminated in price in Sodexho's favor, and that this price discrimination was significant enough in both magnitude and duration to cause competitive injury to Feesers.

Normally the quantum of proof necessary to prove substantial price discrimination depends on the level at which the discrimination occurred. Accordingly, tertiary discrimination (injury to the customers of the disfavored purchaser) generally requires a greater magnitude of price difference to injure competition than secondary discrimination (injury to the customers of the disfavored purchaser). This is because the effects of secondary price discrimination are generally less attenuated, and it is more likely the case that the discount will be passed on to the benefit of the favored purchaser's customer. However, there are limits to the usefulness of the analytical distinctions among the various levels of injury resulting from price discrimination. For instance, in cases where an institution plays a dual role, such as a company functioning as a dual distributor and retailer, courts have declined to label such discrimination as falling at a particular level. *See, e.g.*, *Texaco v. Hasbrouck*, 496 U.S. 543 (1990). The Robinson-Patman Act is concerned with the functions provided by a company, not the label that company chooses to apply.

The Third Circuit has noted that this is one of those cases that cannot be easily categorized as either secondary or tertiary discrimination, but rather falls somewhere between the two. *See Feesers, Inc. v. Michael Foods*, 498 F.3d 206, 211 n.5 (3d Cir. 2007). This is because Sodexho obtains food through its distributor Sysco, though it directly negotiates the price of that food from the manufacturer, Michael Foods. On the other hand, Feesers obtains food directly from manufacturers and sells it directly to institutional customers. Accordingly, the Sodexho transaction introduces an additional link in the supply chain.

Here, Sodexho offers two distinct functions to its customers: management (performed by Sodexho itself) and distribution and procurement (for which Sodexho subcontracts with distributors). In the context of functional discounts, the Supreme Court has observed that "[m]anufacturers will be more likely to effectuate tertiary line price discrimination through functional discounts to a secondary line buyer when the favored distributor is vertically integrated." *Hasbrouck*, 496 U.S. at 565–66. A loose analogy may be drawn between the role played by Sodexho in the distribution chain, and that occupied by the favored dual-function wholesaler/retailers in *Hasbrouck*. Nevertheless, it is clear that the discounts secured by Sodexho from Michael Foods are not retained by Sodexho, but instead pass directly to Sodexho's customers at a level that is likely to cause those customers to choose Sodexho. The evidence also establishes that as a general matter, this is a price sensitive industry populated by increasingly sophisticated customers. Moreover, the discounts secured by Sodexho were not temporary, but rather a long-term arrangement that is precisely the type of price discrimination most likely to harm competition. Accordingly, the court finds that the magnitude of price discrimination in this case is substantial and sustained enough that customers may be persuaded to switch from self-operation to food service management in order to obtain discounts on food products and thereby lower their overall costs of food service operation.

Defendants' argument that there is no competitive injury because Michael Foods products constitute a small percentage of any one customer's purchases is foreclosed by the Supreme Court's decision in *F.T.C. v. Morton Salt*. In

that case, the Supreme Court rejected a similar claim by large grocery store chains that price discrimination in the sale of table salt did not constitute competitive injury:

> There are many articles in a grocery store that, considered separately, are comparatively small parts of a merchant's stock. Congress intended to protect a merchant from competitive injury attributable to discriminatory prices on any or all goods sold in interstate commerce, whether the particular goods constituted a major or minor portion of his stock. Since a grocery store consists of many comparatively small articles, there is no possible way effectively to protect a grocer from discriminatory prices except by applying the prohibitions of the Act to each individual article in the store.

*Id.* at 49. Likewise here, egg and potato products constitute a small portion of any individual customer's food purchases from Feesers and Sodexho.

### C. Competitive Injury

In sum, the court concludes that Feesers has established a prima facie case of price discrimination. Feesers is in competition with Sodexho for the sale of Michael Foods products to institutional customers, and Michael Foods engaged in substantial and sustained price discrimination in favor of Sodexho. Under the facts of this case, Feesers is entitled to the *Morton Salt* inference of competitive injury.

## III. Rebuttal of Inference of Price Discrimination

### A. Legal Standard

Once a plaintiff has established a prima facie case of price discrimination, the burden shifts to the defendant to rebut the inference of competitive injury. *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435 (1983), citing F. Rowe, *Price Discrimination Under the Robinson-Patman Act* 182 (1962). Here, in order to rebut the inference, Michael Foods must show an

45

absence of a causal link between discrimination and lost sales or profits. *Feesers, Inc.*, 498 F.3d at 216; *see also In re Boise Cascade*, 113 F.T.C. 956 (1990).

### B. Findings of Fact

Defendants claim that the evidence presented at trial demonstrates that the lower price Sodexho receives plays no role in a customer's choice between food service management or self-op serviced by a distributor such as Feesers, but instead that customers were motivated by other factors such as services. The court will examine the evidence presented at trial regarding the significance of food costs as opposed to other factors in a customer's decision to switch from self-op to food service management or vice versa. In this inquiry, the court will review three categories of evidence: testimony from customer witnesses, Sodexho's strategic planning documents, and Sodexho's marketing materials.

**Food service budget for institutional customers**

Whether self-op or managed, an institution's food service budget primarily consists of two factors: raw food and labor, with overhead and administrative costs make up the balance of a food service budget. The evidence presented at trial demonstrates that the price of raw food may range anywhere from 20 to 50 percent of a facility's food service budget. These numbers are not static, but may vary depending upon the efficiency of the food preparation, menus, and participation in a dining program. In other words, if food costs are higher, then food constitutes a higher percentage of the food service budget, and the cost of the entire food service budget might be higher. Moreover, the food service industry is extremely price sensitive. This finding is supported by customer testimony about the importance of the bottom line, as well as Dr. Larner's testimony.

The price of raw food is more significant to certain Sodexho customers due to the payment structure set forth in their contracts with Sodexho. Sodexho has two different types of food service management contracts: a profit and loss ("P&L") contract, and a management fee contract. In a P&L contract, which is usually offered only to larger customers, Sodexho offers a financial guarantee that the dining services will not lose money, and the institution shares in a certain percentage of the profits. On the other hand, in a management fee contract, Sodexho receives a set fee for its management services, and it bills the institution for other costs including food. An institution with a management fee contract is more likely to be sensitive to food costs because it is directly invoiced for those costs. On the other hand, customers with a P&L contract also benefit from lower food costs because that increases the profitability of the dining services.

**Customer Testimony**

Michael Foods relies primarily on testimony from ten customer witnesses in an effort to rebut the inference of price discrimination. According to Defendants, the testimony from these witnesses demonstrates that food costs are not a significant factor to customers. The court will first briefly review the testimony, and then explain why it finds this evidence unpersuasive.

Defendants offered testimony from customer witnesses responsible for food service operations at three schools. Robert Bruchak is in charge of dining services for Daniel Boone Area School District. Daniel Boone was originally self-op but switched to Sodexho in 2004. The change was prompted by the sudden resignation of the school's food service director. Daniel Boone solicited proposals in a formal RFP process, and ultimately chose Sodexho because Sodexho identified

potential cost savings in labor management and provided a financial guarantee of profitability. Throughout this process Bruckak did not perform a line by line comparison of the cost of food, though a school board member once requested invoices. For a time, Daniel Boone continued to utilize Feesers for NOI purchasing, with savings of about $60,000 annually. According to Bruchak, Sodexho told Daniel Boone that it offered lower prices for food in its proposal, but this was not the deciding factor for Daniel Boone.

Stanley Majewski is responsible for food service operations at Bethlehem Area School District. The school district was self-op until 1999, when it switched to management under Wood and later Sodexho. At the time of the switch, the institution considered both self-op and food service management. The district's primary consideration was service, not cost, and Sodexho won the contract because it had more management experience than other bidders in the RFP process. Nevertheless, food costs constitute about forty percent of the institution's dining services budget paid to Sodexho, and that portion of the budget previously went to Feesers. There is also evidence that costs were important to the school district: to win the contract, Sodexho promised a large investment in the kitchen, and the district participates in the NOI program to save money on food costs.

David Matyas oversees food service at Central Bucks School District. The institution was previously self-op and switched to Sodexho management. The change was motivated primarily by financial considerations, particularly the financial guarantee of profitability offered by Sodexho. According to Matyas, food costs by themselves are not an important concern for the school because the financial guarantee puts the pressure on Sodexho to ensure that revenue equals expenses.

Matyas believes that the financial guarantee is unrelated to Sodexho's discounts and reimbursements for food costs, but offered no explanation for this belief.

Defendants also offered testimony from two college and university customers. Dr. George Harpster is responsible for overseeing the food service program for Shippensburg University. The university has utilized food service management for as long as the witness has been responsible for dining services, at least since 1987. To choose a food service management company, the university submits requests for proposals to management companies. Shippensburg chose to give greater weight to qualitative factors than quantitative factors in the RFP process. According to Dr. Harpster, Shippensburg University has never considered self-op, and Dr. Harpster has no conception of how the institution could switch to self-op, or what factors he would consider in making the decision. Dr. Harpster testified that he was under the impression that in the instant litigation Feesers was seeking the opportunity to bid for food service contracts during the RFP process.

Wayne Clickner is a food service consultant for the fourteen public universities that are members of the Pennsylvania State System of Higher Education (PASSHE). Clickner has been involved in the RFP process for dining services at the PASSHE member schools on at least thirteen occasions. One such RFP process was Slippery Rock University, which switched from self-op to food service management with Sodexho. According to Clickner, Slippery Rock's decision to switch from self-op to management was motivated primarily by the university's desire to avoid working with unionized employees, rather than the cost of food. Clickner testified that in his time evaluating proposals, he had never observed a university choose to contract with a management company based solely on the cost of individual food

items. However, total meal cost is an important consideration, and meal cost is determined in part by the cost of raw food and Sodexho's financial investment in the dining services program. Clickner also testified that all of the PASSHE schools have P&L contracts, rather than management fee contracts.

Defendants offered testimony from three retirement community customers. Michael Jacobs is responsible for food service at Deer Meadows Retirement Community. Deer Meadows Retirement Community is managed by Sodexho. Jacobs testified that he has never considered self-op in the past and would never consider it in the future. Moreover, Jacobs testified that he had no idea what factors he would need to consider in deciding to make such a switch. The institution has a management fee contract with Sodexho, so it reimburses Sodexho directly for the cost of food. Although Jacobs has never compared the cost of food in the past, he testified that if food costs increased substantially, he would investigate.

Michael Peck is responsible for dining services at York County Pleasant Acres Rehabilitation Center, a long term care facility. The facility is currently managed by Sodexho. In 2003 the facility solicited proposals by other food service management companies. Because the problems were related to service, not costs, financial considerations were given the lowest priority when the proposals were evaluated. Peck testified that he believed food costs were more fixed than labor costs, but on cross examination acknowledged that if the facility were to switch to self-op, he would utilize a GPO or seek out other purchasing options to save money on food.

Seth Levy is responsible for overseeing food services for the Jewish Home of Greater Harrisburg. The facility was self-op until 2003, when it switched to

Sodexho management.  The decision to outsource was made after the food management team resigned, and Levy was unable to recruit experienced replacements.  The institution chose Sodexho because it offered a lower overall cost than other management companies.  Sodexho's proposed budget was also significantly lower than the institution's self-op food budget.  Although cost was important, at the time the decision to outsource was made, Levy did not compare the cost of specific food items on a line by line basis.  Levy testified that he understood that Sodexho's promise to drive down food costs in its proposal meant that Sodexho could get a better price than its competitors because of the volume of food it purchased.

Defendants also presented testimony from two hospital customers. Joseph Gagliardo is responsible for food services at Lewistown Hospital.  The hospital was self-op until 2007, when it switched to Sodexho management.  The decision to switch was motivated primarily because of service issues, rather than cost, and the institution performed no line-by-line comparison of the cost of food.  Lewistown Hospital has a management fee contract with an investment for renovation.

Philip Guarnaschelli is responsible for overseeing Pinnacle Health's food service operation.  Pinnacle was self-op fifteen years ago but switched to Wood (later Sodexho) in 2001.  When the hospital made the switch, it was concerned about labor costs and management expertise, rather than food costs.  Guarnaschelli testified that at this point, Pinnacle is committed to management and would not consider returning to self-op.  However, on cross examination he testified that if he were to consider switching, he would compare the total cost of management to the total cost

of self-op.  Guarnaschelli also testified that he would consider a savings of 25% on the cost of food significant.

Finally, Defendants presented testimony from Clyde Harris, who oversees food service operations at Air Products and Chemicals.  Harris testified that the company has outsourced its dining services for at least ten years, and has no intention of ever switching to self-op.  The company chooses to outsource because it does not have the skill or desire to self-op, and Harris testified that he does not know what factors the company would need to consider to make the decision to self-op.

According to Defendants, the customer testimony establishes that price is not an important consideration for institutional food service customers.  Instead, Defendants claim that labor issues, management expertise, and other factors are more important to customers than price.  However, the court is not satisfied that such a broad inference can be drawn from the experience and perception of these witnesses.  Most of the witnesses were satisfied Sodexho customers.  Sodexho promised them a low price for food, and delivered on that promise, in part by securing a lower cost for Michael Foods products than its competitors.  Though none of the witnesses could recall the price of Michael Foods products in particular, it was apparent to the court that the witnesses had not felt the need to verify Sodexho's prices.  However, this does not mean that none of the customers for whom Feesers and Sodexho compete is concerned about the cost of food.  This apparent lack of concern about pricing may be due to the fact that many of the witnesses had P&L contracts, rather than management fee contracts.  This means that the witnesses were more concerned with the bottom line than with the component prices of the services offered by Sodexho.

Defendants point out that the Third Circuit found customer testimony pertinent to the issue of competitive injury its opinion reversing this court's grant of summary judgment in favor of Defendants. *See Feesers, Inc.*, 498 F.3d at 214–15. Indeed, if Feesers had produced customer witnesses who testified that the cost of food was the reason they switched from Feesers to Sodexho, that evidence would have been extremely persuasive on the issue of competitive injury. However, testimony presented by Defendants from a few customers who did not find price significant does not have the same weight, particularly where as here, there is other evidence suggesting that price is quite important to other customers in the same industry. Here, the testimony of Defendants' customer witnesses cannot be reconciled with other persuasive and undisputed evidence of the importance of price to other customers—namely Sodexho's strategic planning documents describing the importance of price to win and retain customers, and the proposals and promotional material submitted by Sodexho to win customers. This evidence demonstrates that the cost of food is a significant part of the food service budgets for these institutions. The court will briefly review a number of these documents submitted by Plaintiff at trial.

**Sodexho Strategic Planning documents**

Sodexho's strategic planning documents and testimony from Sodexho's employees demonstrate the importance of price for Sodexho to win and retain customers. Christopher Rochette, former Sodexho Senior Vice President of Strategic Planning, testified that from 2000 until 2005, Sodexho's strategic plan was to position itself as the low cost provider in the education and health market. This goal is reflected in Sodexho's strategic plans during that time. For instance, in noting

increased economic pressures on hospitals, Sodexho's Health Care Services Strategic

Plan Phase I: FY 03-05, predicted the following implications:

> Our client will seek a series of products and services which produce cost savings at acceptable quality levels . . . We will have to organize and allocate resources to the development of money saving products and services. . . Clients may demand to see pricing on a line item basis for ease of price/vendor comparison.

(P182 at 5.)  Sodexho's strategy to achieve dominant market share included

"[e]stablish[ing] competitive food pricing so [Sodexho] is competitive at the loading

dock versus GPO pricing structure."  (P160 at 31.)  Sodexho offered the following

summary of competitor findings for self-op in its:

> Summary of Competitor Findings, Self-Operated
> Finding: "Increasing perception that comparable or better purchasing economies can be obtained through GPOs.  Accordingly, there is an increasing number of facilities seeking/joining GPOs."
> Implications: "Economies of scale advantage will carry less weight than in the past, purchasing will come under increased scrutiny, more GPOs."
> Possible response: "Quality products and offerings at defined price points. . . Proactive market basket analysis, Procurement marketing."

(Competitive Intelligence Overview Findings, Health Care Services: Hospitals Phase

I, 2003, P170 at 4.)

Likewise, Sodexho's Health Care Services Strategic Plan Phase I: FY

03-05 noted a trend towards greater cost-consciousness among its customers, fueled

in part by a wider variety of procurement options, such as GPOS:

> GPOs / E-commerce industry trends
>
> GPOs / E-Commerce: The growing number and complexity of GPOs combined with the emergence of e-commerce business applications in the procurement arena have, in effect, equalized the playing field enabling all entities to gain procurement leverage.  Even a non-GPO aligned stand-alone facility can aggregate its buy with other facilities through E-commerce.  Our historical pricing advantage is dramatically minimized.  Additionally, GPOs increasingly dictate many or all aspects

of the procurement process including product selection, distribution, etc.

(P182 at 16.)  The implication of this trend for Sodexho Senior Services: "Historical and clear point of differentiation will not be there for us in the future" "Increasing amount of time defending and explaining (market baskets, meetings, etc.) our prices" "We are on the defensive and our credibility suffers" "Competitors may gain access to our accounts through 'back door' purchasing relationships." (P182 at 16.) "The desire for cost reductions is the number one impetus for School Districts to consider outsourcing."  (P190 at 15.)

Strategic planning documents for other segments of the institutional food service industry also emphasize the importance of food costs in winning and retaining customers.  In its Strategic Plan for School Services Division, Sodexho noted that "[t]he desire for cost reductions is the number one impetus for School Districts to consider outsourcing."  (P190 at 15.)  The plan went on to note that "[m]anufacturers and vendors are providing value-added services that compete directly with the support services provided by private management companies," (*id.* at 18), and "[c]ompetitors, like ourselves, have not found the lever to open up demand for self-op conversion to outsourcing.  Self-Ops use contractors to 'fix' current problems and then return to self-op or use the RFP process to gain ideas but remain in-house."  (*Id.* at 19.)

Likewise, Sodexho's number one "strategic imperative" for its Senior Services division was the development of a "Low Cost Food Model."  (P179 at 4.) There is also evidence that lower food costs were important to customers in Sodexho's corporate services division.  (*See* Sodexho Corporate Services 3 Year

Plan Phase I, P396 at 42 (describing initiatives to lower food costs to benefit customers).

The strategic planning documents also indicate that Sodexho utilized discounts to increase its profit margin. For instance in Sodexho's Health Care Services Strategic Plan Phase I: FY 03-05, a key initiative was a "gross profit improvement plan" achieved by lowering food costs and capturing additional volume discount allowances from manufacturers:

> Key Initiative #7: Purchasing Improvement Plan
> Performance improvement objective
> To maximize Gross Profit Margin and to maximize our GPO &
> Strategic Business partnerships while attempting to address the growing
> issues surrounding our uncompetitive market basket results in the field.

(P160 at 23.) This initiative included the creation of a "Competitiveness Task Force to address food cost competitiveness in the field, addressing issues of maintaining the balance between food cost and VDA income. . ." (*Id.*) Together, these strategic planning documents indicate that lower food costs are critical both to win and retain new customers and to improve Sodexho's profit margin.

**Sodexho Promotional and Marketing Materials**

Even more persuasive than its strategic planning documents, however, are Sodexho's promotional and marketing materials. The marketing information admitted into evidence demonstrates that Sodexho emphasized its procurement power as a selling point when trying to win customers.

References to Sodexho's lower prices were ubiquitous in Sodexho's promotional materials to customers. For example, in a proposal to Charlestown Retirement Community, Sodexho emphasized that it could provide customers with lower prices for food than a self-op could obtain from distributors:

**Sodexho's Procurement Systems**
Sodexho Health Care Services' clients have the option of selecting the purchasing and distribution services that best meet their needs. Experience has shown that when our clients evaluate procurement and distribution, they focus largely on the cost of goods. While virtually all of the analyses performed indicate that Sodexho-procured food and supplies are less expensive than a market basket of goods of comparable specification and quality purchased from a non-Sodexho source, it is important to recognize the many other relevant factors to consider when evaluating procurement and distribution services.

(P74 at 11.) The proposal goes on to compare the advantages and disadvantages of food service management versus self-operation. The first two advantages of food management include "[m]inimum food procurement costs through mass purchase" and "[f]ood contract management companies employ specialized staffs which focus on bidding food items, evaluating costs daily, and developing purveyor relationships to minimize food costs." (P74 at 14.) Conversely, the number one disadvantage to self-operation is that "[a] self-operated Food Service can only obtain the purchasing power in food procurement it can negotiate. Food procurement will depend largely on the prevailing prices extended by the local market. Group purchasing contracts for food are available but are only good for certain items. . ." (P74 at 16.)

In a proposal to Messiah Village, Sodexho told customers that "you compete on costs, but you win on quality" and noted that Sodexho had a "[s]olid track record of consistently driving costs out year over year." (P62 at 4.) This language appeared in numerous other proposals, including Villa Teresa Nursing Home (P85 at 65), Jewish Home of Greater Harrisburg (P79 at 4), and the Madlyn and Leonard Abramson Center for Jewish Life (P118 at 3). In a proposal to Southern Ocean County Hospital, Sodexho described itself as "the industry leader in procurement" "offer[ing] vast purchasing volumes" with the outcome of reduced costs to the customer. (P142 at 28.) In another proposal submitted to Lancaster

Regional Medical Center, Sodexho boasted that "[o]ur prices for most items range from 5 to 25% lower than the next best price." (P89 at 17.)

An institution's request for a "market basket" is another indication that an institution is more price-sensitive. A market basket is a list of prices on a variety of individual food items requested so that the institution can perform a line by line comparison of costs. According to Feesers' sales employees, these are almost always requested by self-op customers seeking bids from distributors. However, some institutions also request market baskets from food service management companies when considering whether to switch from self-op to management, indicating that the cost of food is a significant factor in that determination. According to Sodexho's Jay Marvin, market baskets are requested by about 10% of potential customers in the health care industry. For example, in a proposal to Lehigh University, Sodexho touts the volume based discounts it receives from manufacturers and suggests that these discounts will result in a more competitive market basket:

> As one of the largest purchasers of food in the nation, Sodexho uses this leverage to provide our customers with access to high quality, name brand products at competitive pricing. Because of the volume of our purchasing, and our ability to provide win-win guarantees to our vendors, Sodexho is a very attractive and in-demand customer for the leading manufacturers and distributors across the country.

(P95 at 62.) According to Sodexho, these volume discounts would have the following benefits to Lehigh University: "First, it assures that on a market basket approach each of our units receives competitive pricing at the account level. . . In many instances, we are able to make purchases for, or on behalf of our customers, at substantial savings." (*Id.*)

To streamline the process of preparing proposals to customers, Sodexho created certain templates, many of which emphasize that Sodexho is able to obtain

lower prices on food than self-ops as a result of its larger purchasing volume. The court will now examine some of those templates in turn.

The "Focus on Procurement" template appears in a number of Sodexho's proposals to colleges and universities, including Sodexho's proposal to Camden County College:

> Sodexho is part of an international purchasing network, one of the largest private purchasing networks in the nation. It includes hotels and restaurants around the world as well as thousands of dining services partnerships around the country.
>
> Because of this volume—and our ability to provide win-win guarantees to our vendors—Sodexho is a very attractive and in-demand customer for high quality manufacturers across the country. This fact provides a number of benefits for our college and university dining service partners.
>
> First, it means the most competitive prices on the widest selection of products. While on occasion a local overstock or other unique situation can 'beat' us on a single item, when it comes to all the products consumed by a dining service operation day in and day out, the overall prices we are able to command on your behalf are the most competitive offered anywhere.
>
> It should be noted that these volume agreements are not with 'generics,' but with recognized leaders in every category. . . In addition, our national volume means a lot more 'extras' for our clients, such as third party training materials, supplementary marketing materials and special promotions, the opportunity to test new products, services, custom-created products and equipment as well as more responsive service than ever before.

(P94 at 83.) This template has been used by Sodexho in proposals to Alvernia College (P81 at 59), Howard Community College (P137), St. Mary's Seminary and University (P130), Cheyney University of Pennsylvania (P120), and Hood College (P114).

The "Tremendous National Buying Power" template is also used in Sodexho's proposals to colleges and universities, such as Bloomsburg University:

59

> Sodexho Marriott Services obtains only the highest quality raw food products for use in the production of all consumable items. Under the direction of our Senior Vice President for Purchasing, the Purchasing Department with its professional food buyers, adheres to the highest specifications in the industry.
>
> At Sodexho Marriott Services, our purchasing program is designed to let our professional buyers and purchasing agents apply their skills full-time to the job of providing our clients with the finest available food products at the lowest possible cost.
> . . .
>
> Sodexho Marriott Services' tremendous national buying power will be utilized whenever possible for cost advantages. . . .
>
> Sodexho Marriott Services maintains a corporate purchasing department that is advantageous for us in many ways. The purchasing department works with companies to obtain the lowest possible prices. The lowest prices are then locked in through long term contracts. . .

(P91 at 362.) This language also appeared in a proposal to Shippensburg University (P90 at 353).

Sodexho's "Controlling Costs by Leveraging Procurement Power as the Largest Purchaser of Food" template appears in a Sodexho proposal to the Friends School of Baltimore:

> Maximize value. We deliver the highest levels of quality and service, while staying within the funding levels. We will control costs by employing proven financial controls, training programs, and operational efficiencies, and by leveraging our procurement power as the industry's largest purchaser of food.

(P78 at 1.) A few pages later, the template continues:

> As the largest private purchaser of food in the country, Sodexho has partnerships with some of the largest, most familiar and most beloved brands in the nation. You should expect us to apply our purchasing leverage to deliver superior quality products at prices below those available to individual schools or smaller providers.

(P78 at 14.) This template appears in proposals to other schools, including the Archdiocese of Philadelphia, (P75 at 14), the George School (P119), Waldron Mercy

Academy (P117), Abington Friends School (P61), Haverford School (P107), Salesianum School (P105), Moravian Academy (P103), and Norfolk State University (P59).

Another template, "Bringing in the Best at a Price Point Unavailable to Smaller Providers," was used in a proposal to Warren County Public Schools:

> As the largest private purchaser of food in the country, Sodexho Marriott Services has partnerships with some of the largest, most familiar and most beloved brands in the nation, bringing in 'the best' at a price point unavailable to individual schools or smaller providers.

(P150 at 150.) This template also appears in proposals to the Blue Ridge School (P88 at 19), Northern Burlington County Regional School District (P87 at 61), Piscataway Schools (P147 at 87), Carteret School District (P86 at 107), Spotswood School District (P144 at 114), Penns Valley Area School District (P141 at 67), School District of the Chathams (P140 at 79), Queen Anne's Public Schools (P80 at 115), and the Hazleton Area School District (P136 at 70).

Another Sodexho template, "Deliver prices below those available to smaller providers," was used in a Sodexho proposal to the Freehold Regional High School District:

> As the largest private purchaser of food in the country, Sodexho has partnerships with many of America's favorite brands. . . You should expect us to apply our purchasing leverage to deliver superior quality products at prices below those available to individual schools or smaller providers.

(P145 at 93 and 105.) The template goes on to tout the advantages of Sodexho's procurement leverage:

> **Procurement**
> Food and supplies are a major portion of the cost of a food service program. Sodexhos purchasing plan for your district consists of the following primary elements:

- Buying power

. . .

Sodexho's extensive network of purchasing resources will continue to strive for lower prices of food and supplies for your District while improving the quality of the products you use. With Sodexho's buying power your District has the opportunity to experience a significant decrease in the cost of the products you use.

. . .

Your District will continue to benefit from Sodexho's buying expertise. Our reputation and size give us buying advantages over smaller food service management organizations. In turn, the savings in which we obtain will be passed on to your District. You will be charged the same prices as Sodexho pays for all products. Your District will receive all the benefits of our volume and trade discounts, except for cash discounts. Sodexho will utilize its technical support and its national and local buying power whenever possible to obtain the best value for your District.

(P145 at 109.) Finally, the template drives home the message that Sodexho's lower prices for food will result in reduced costs for the customer:

- We have successfully transitioned 300 school districts from self-operation to outsource management and consulting services.
- We are the high quality - low cost provider. . .

When Sodexho assumes the management of self-operated food services, everyone benefits. . . . The cost always goes down. Always.

(P145 at 43.) This template was used by Sodexho in proposals to Franklin Township Schools (P127), Springfield School District (P76), Boonton Public Schools (P73), East Penn School District (P115), South Plainfield School District (P116), Berlin Township School District (P69), Manheim Township School District (P70), Chesterfield School District (P71), Daniel Boone Area School District (P65), Carmichaels Area School District (P101), and Warren County Public Schools (P150 at 181).

A template touting "reduced costs from vast purchasing volumes" was utilized in proposals to health care institutions, including Southern Ocean County Hospital:

> **Procurement**
> **Outcome: Reduced Costs**
> As the industry leader in food procurement, Sodexho offers vast purchasing volumes. Because of our many operations across the country, you're assured of safe, reliable products at competitive prices.

(P142 at 28.) This template also appeared in Sodexho proposals to Clearfield Hospital (P84 at 28), Holy Redeemer Health System (P82), St. Joseph Medical Center (P139 at 24), Village at Morrison's Cove (P129), St. Lawrence Rehabilitation Center (P124), Marian Manor (P113), Brookline Village (P112), St. Luke's Hospital (P60 at 151), Bridgewater Retirement Community (P104), and Lorien Nursing & Rehabilitation Center (P100).

Sodexho's Corporate Services division also utilized templates touting its lower prices. For instance, in a proposal to Bassell USA, Inc., Sodexho stated: "Why Sodexho? One of the Largest Buyers of Food in the United States. . . Assists in reducing food costs through increased purchasing power." (P83 at 34.)

## C.    Conclusions of Law

Based on these findings of fact, the court concludes that Defendants have failed to meet their burden of rebutting the inference of competitive injury by showing that there is no causal connection between the price discrimination and competitive injury to Feesers. The evidence presented at trial demonstrates that food costs constitute a significant portion of institutional food service budgets, and that lower food costs were an important part of Sodexho's strategic plans to win and retain customers, and improve its profit margin. Most significant, Sodexho touts its

lower prices in promotional material to customers. In light of this evidence, the court declines to draw any broad inference from the testimony of the customer witnesses called by Defendants. The court concludes that Defendants have failed to rebut the inference of competitive injury.

**IV.**      **Meeting Competition Defense**

   **A.**   **Legal Standard**

Section 2(b) of the Robinson-Patman Act permits a seller to rebut a prima facie case of discrimination by "showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor." 15 U.S.C. § 13(b). This is known as the "meeting competition" defense.

The purpose of the defense is to promote competition by permitting a seller to defend itself against inroads by a competitor. Accordingly, a seller invoking this defense must establish that the price concession was granted in order to meet—not beat—a lower price offered by a competitor. If a seller successfully asserts the meeting competition defense, then there can be no liability for the buyer who induced the discriminatory prices. *Great Atlantic & Pacific Tea, Inc. v. F.T.C.*, 440 U.S. 69, 77–78 (1979). In order to successfully invoke the defense, a seller need not prove that it in fact met a lower price offered by a competitor. *F.T.C. v. A.E. Staley Mfg. Co.*, 324 U.S. 746, 759–60 (1945). However, the seller must prove that the lower price was offered in good faith to meet its competitor's price. If a seller offers a lower price in bad faith, there can be no defense, even if the price did not beat competition. *Great Atlantic & Pacific Tea, Inc.*, 440 U.S. at 83 ("Since good

64

faith, rather than absolute certainty, is the touchstone of the meeting-competition defense, a seller can assert the defense even if it has unknowingly made a bid that in fact not only met but beat competition.") Conversely, if the seller acted in good faith, the defense may be invoked even where the price offered fell below that of a competitor. *See, e.g.*, *id.* at 83–84 (upholding meeting-competition defense where seller's offer was lower than competitor's because seller's offer was reasonable and made in good faith).

Good faith is a "flexible and pragmatic, not a technical or doctrinaire, concept. The standard of good faith is simply the standard of the prudent businessman responding fairly to what he reasonably believes is a situation of competitive necessity." *Falls City Indus. v. Vanco Beverage, Inc.*, 460 U.S. 428, 441 (1983) (quoting *In re Continental Baking*, 63 F.T.C. 2071, 2163 (1963)). In order to satisfy this standard, the seller must "show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." *A.E. Staley Mfg. Co.*, 324 U.S. at 759–60. Generally, to establish good faith the seller must show that it engaged in at least some reasonable inquiry to evaluate a claim of a lower price by a competitor. *Viviano Macaroni v. F.T.C.*, 411 F.2d 255 (3d Cir. 1969).

No particular method of verification is required in order to establish the meeting competition defense. However, the Supreme Court has identified a number of factors which, though not exhaustive, may be useful in evaluating the good faith of the seller. These include evidence that (1) "a seller had received reports of similar discounts from other customers;" (2) a "seller was threatened with the termination of purchases if the discount were not met;" (3) the seller's "efforts to corroborate the

reported discount by seeking documentary evidence;" (4) the reasonableness of the competing offer in light of available market data; and (5) "the seller's past experience with the particular buyer in question." *U.S. Gypsum*, 438 U.S. 422, 455 (1978) (internal citations and quotations omitted).

Verifying a competitor's price can be difficult. Generally the only two options available are to ask the buyer, or to ask the competitor, both of which have their drawbacks. Buyers may be reluctant to share the specifics of a competing offer, in the hope that a seller will offer an even lower price, or they might lie about the price offered. *See, e.g.*, *In re Beatrice Foods*, 76 F.T.C. 719 (1969). Another risk is that the buyer will refuse to answer, or threaten to terminate business dealings altogether. *See, e.g.*, *Great Atlantic & Pacific Tea Co., Inc.*, 440 U.S. at 69. On the other hand, direct communication with a competitor about prices, even for the purpose of verifying a competing offer, entails the risk of violating the price-fixing provisions of the Sherman Act. *See, e.g.*, *United States v. U.S. Gypsum*, 438 U.S. 422 (1978). Moreover, as the Supreme Court has observed, competitors have an interest in keeping price concessions secret: "[p]rice concessions by oligopolists generally yield competitive advantages only if secrecy can be maintained; when the terms of the concession are made publicly known, other competitors are likely to follow and any advantage to the initiator is lost in the process." *Id.* at 456.

Thus, in a situation where a seller has limited information about the prices offered by his competitors, the meeting competition defense may be unavailable "since unanswered questions about the reliability of a buyer's representations may well be inconsistent with a good-faith belief that a competing offer had in fact been made." *U.S. Gypsum*, 438 U.S. at 455–56.

**B.** **Findings of Fact**

Michael Foods' defense centers on the negotiations for three contracts, each for a duration of three years: the 1999 egg contract, the 2002 egg contract, and the 2002 potato contract. However, the discriminatory prices persisted during the entire period at issue in this case—from 1999 until 2004. Michael Foods presented testimony from Vicky Wass, the main negotiator for Michael Foods. Defendants chose not to call Sodexho's negotiator as a witness.

For the purpose of this litigation, the first significant contract between the parties was the 1999 egg contract, which Wass negotiated on behalf of Michael Foods. This contract included deeply discounted deviated prices on many Michael Foods egg products, a million dollar signing bonus, and other rebates. Wass testified that she believed these discounts were necessary to meet competition. However, at the time this contract was negotiated, Wass did not know of any other offer by a particular competitor, but she believed competitors would offer similar prices because Sodexho was such a large and attractive customer. According to Wass, during this negotiation Sodexho did not mention any other competitor by name, describe any other offer it had received, or otherwise imply that it had received another offer. Nor did Wass do any investigation to determine whether the discounts offered by Michael Foods to Sodexho matched similar discounts offered by competing food manufacturers:

> Q. My question is, when you negotiated this '99 agreement, do you recall doing anything to check what the competitive prices were being offered to Sodexho to make sure you weren't beating those competitive prices?
>
> A. I recall I was in a competitive situation with my competitor on the 1999 agreement as well as the 2002 agreement.

Q.   In '99 specifically, do you recall seeing any prices of a competitor from Sodexho?

A.   I don't recall, but I remember conversations about such.

Q.   Okay.  Do you recall conversations about specific prices being offered by a competitor?

A.   Not specific, but in scope, yes.

Q.   In scope?

A.   In scope.

Q.   What do you mean by in scope?

A.   Essentially, where I had to be, maybe not showing me exactly a price to match a price, but looking at the entire portfolio of what I was offering and asking me to, you know, do a better job with my pricing.

Q.   Well, do you recall in '99 if anyone, either orally or in writing, gave you a specific price of a competitor being offered to Sodexho?

A.   Specific price, no, sir.

Q.   Do you recall anyone telling you what the duration was of the offer of a competitive price they had from someone else in 1999?

A.   No, I do not.

Q.   So you didn't know the duration.  You didn't know the specific price.  Correct?

A.   No, not the specific price.

Q.   So all you knew was, Sodexho said, you've got to do better?  I need a better price.  Correct?  That's fair?

A.   They would tell me—yes.  Generally, yes, sir.

(Trial Transcript, Jan. 18, 2008, 188:15–189:22.)  Thus, when Sodexho requested price concessions, Wass simply assumed that the requested concessions matched an offer Sodexho had received from a competitor.  However, Defendants presented no

evidence at trial to support this assumption, and it seems more likely that Sodexho simply wanted better prices and felt that it was a big enough customer to push for it. Accordingly, the court finds that Defendants have failed to meet their burden of proving that the discounts on the 1999 egg contract were offered to meet competition.

Likewise, Defendants presented no evidence about the terms or duration of any offer Sodexho may have received from other egg or potato companies for the 2002 contracts. Wass was also responsible for negotiating the 2002 egg and potato contracts on behalf of Michael Foods. During the course of the negotiation, Wass sought advice from her supervisors, Dean Sprinkle and Mark Westphal about offering a new discount to Sodexho on the egg contract. (November 13, 2001 email from Vicky Wass to Dean Sprinkle, P210.) In this negotiation, Michael Foods was proposing to reduce the number of products on deviated pricing and instead offer larger rebates off of the list price. In the email, Wass warned Sprinkle that Sodexho "wants something significant," but the price discount proposed was not linked to any specific offer to Sodexho by a competitor:

> Q. And when you were proposing, offering to him, and we'll go through the other terms of the offer, the new terms of the deal—
>
> A. Yes.
>
> Q. —at that point, in November 13, 2001, Sodexho hadn't mentioned a word about any competitive offer yet, correct?
>
> A. This negotiation went on for quite a while. There was back and forth. And there was some talk—I mean, it was almost an expectation on my part that my competition would be there, number one. Number two, you know, there was an inference that I wasn't sharp enough, that this wasn't working, that, you know, he wanted something better.

Q. I understand he told you he wanted something better, it wasn't working. He didn't tell you, here is a specific competitive proposal you have to meet, right?

A. He didn't show me one.

Q. He didn't orally tell you the details of one?

A. He did not orally tell me the details of that proposal, no sir.

Q. And, in fact, on November 13, he didn't even yet mention the name of a specific competitor as of the 13, correct?

A. I can't recall. I mean these were lengthy. I mean, I can't recall.

(Trial Transcript, Jan. 18, 2008, 203:17–204:14.)

Two weeks later, in another email to Dean Sprinkle, Wass stated that Michael Foods needs to do better on its pricing and that Sodexho had told her that if Michael Foods did not do better, it would lose both the egg and the potato contract. (Email from Vicky Wass to Dean Sprinkle, P209.) When pressed for the details of this negotiation with Sodexho, Wass testified as follows:

Q. And he told me that, if we hold with this present proposal, that the egg contract will be awarded to Sunnyfresh and we will not be awarded the potato contract, correct?

A. That's correct.

Q. But he did not tell you any detail of what would be in any contract with Sunnyfresh, right, not one detail?

A. He did not give me any specific pricing, any specific rebates, no specific.

Q. About anything?

A. He told me my deal was not as good as theirs.

Q. And you didn't ask him for any of those details, right?

A. I would not. I wouldn't think to ask him for that.

Q.   No one told you in the company, Vicky, if he wants us to give a better price, go out and find out the details.  Ask him to give you the details.  No one told you that, right?

A.   It's not done that way.  I mean, you can't—you're not going to go and ask the customer to provide documents, because that's unethical and it's really bad for them.  The only way I would be able to confirm and 100 percent verify that would be going to Sunnyfresh, and Sunnyfresh isn't going to give me that information either.  So when you are looking at that, you've got to look at all the resources and all of your experience and come up with some kind of a summation of what you think is real.  I did know at the time—Sunnyfresh, traditionally, is lower cost than we are, traditionally.  I do know that other agreements that we've been negotiating, not only myself, as well as my team members, were getting like, you know, like pricing.  I was not surprised by the things that was coming forth on his demands.  But did I see something?  Did I see a document?  No.

Q.   You didn't hear any details either?  You didn't see it or hear it?

A.   I asked him how close I needed to be, you know, in order to meet the competition.

Q.   Did you know how long any offer was from Sunnyfresh, whether it was a one-year deal, a two-year deal, anything about any length?

A.   No.

Q.   Did you know what the signing bonus would be from Sunnyfresh?

A.   No.

Q.   Did you know what the rebates would be from Sunnyfresh?

A.   No, sir.

Q.   Did you know what the specific price would be, the starting price from Sunnyfresh?

A.   No, I did not.

Q.   As you're sitting here today, when you made this offer, you had no way of knowing whether you were going to be below Sunnyfresh, at Sunnyfresh, or better than Sunnyfresh?  You had no way to know, right?

A.     There's no way to know exactly what he had on his desk.

Q.     But I'm not talking about exactly, like you didn't know like to the penny. You had no way of knowing at all? You could have been 20 percent better than Sunnyfresh. You could have been 20 percent worse than Sunnyfresh. You had no way of knowing at all, right?

A.     Only what my experience with—what their behavior was with other agreements, that's the only way I would have a good concrete idea that we were—that what he was saying was accurate.

(Trial Transcript, Jan. 18, 2008, 209:8–211:21.)

Wass further explained the difficulty in determining the prices offered by a competitor during examination by defense counsel:

Q.     Now with such strong competition as to both eggs and potatoes, what does Michael Foods do to try to keep informed about competitive condition, competitive pricing?

A.     Well, we're limited on what we have access to, but we certainly keep our ear to the ground and are constantly watching what the markets are doing, what the egg markets and potato markets are doing, as well as what the marketplace is doing, you know, how aggressively our competitors are approaching these customers. And we get some competitive intelligence through that by just kind of knowing where they're trading or what they're providing to other—in other negotiations.

Q.     Do you sometimes lose accounts to your competitors?

A.     Absolutely.

Q.     Do you sometimes find out competitive information through that event?

A.     Very rarely. We hardly ever find out after the fact.

Q.     So how hard is it to go specific information about your competitors' pricing?

A.     It's very difficult. The only way we would get that, if the competition would provide that data to us.

Q.     How often do your competitors tell you?

A.     That would not happen at all. Also, we, our customers, it's bad form, and it's unprofessional, and it's not done, nor do we ask it very intently because we certainly don't want our customers to be sharing our pricing programs with our competition. So it's bad form to go there, and it's—we're never provided that information.

Q.     Did you try to keep generally aware of market pricing, market competition?

A.     Certainly.

(Trial Transcript, Jan. 28, 2008, 13:1–6.) When asked about other methods of competitive intelligence, Wass testified that Michael Foods could roughly determine the prices offered by competitors when it lost contracts through competitive bidding:

Q.     . . . Was there other general market intelligence information you could look to, to see whether you thought that Sunnyfresh terms you were being told about seemed plausible?

A.     The only basis that I would have is, I would know what the egg markets were doing at that time. And a lot of times, you kind of know where people are trading whenever the egg markets are where they are. Then the other piece of it is, the other contracts that were being negotiated, those that we were losing or those that we were winning, we pretty much could probably gather some general intelligence if indeed what was being offered up by Sodexho at that time was reasonable, not surprising.

(Trial Transcript, Jan. 28, 2008, 26:18–27:6.) However, Wass later testified that in the competitive bidding process, Michael Foods does not typically know how well its bid measured up to successful competitors:

Q.     Do you have any experience previously with Sodexho where they made a demand, and then you found it was close to your competitor's price?

A.     No, not afterwards, no.

Q.     And you don't have that experience your whole time with Sodexho, right?

A.     No, you normally don't find that out. It's not a public bid.

(Trial Transcript, Jan. 18, 2008, 212:5–12.)

Shortly before the commencement of the 2002 egg contract negotiations, Sodexho invited Michael Foods to submit a bid to supply potato products as well, which Michael Foods did not sell to Sodexho at that time. During these negotiations Michael Foods was aware that Resers, a competitor, was the incumbent on the contract, but it knew nothing about the terms of any offer Resers was making. In these negotiations, led by Vicky Wass, Michael Foods offered significant rebates on potato products to Sodexho. However, Wass testified at trial that Michael Foods had no way of knowing the terms of any offer by a competitor such as Resers, and how close Michael Foods' offer came:

> Q.    I'm asking, Ms. Wass, on the potato contract, and we'll get to the contract, you offered, for example, sizable rebates on certain kinds of potatoes, correct?
>
> A.    We offered rebates, yes, sir.
>
> Q.    And you have no way of knowing, when you offered that, whether the incumbent was offering the same rebates, bigger rebates, or smaller rebates, correct?
>
> A.    No, sir, I don't.
>
> Q.    You had no way of knowing whether or not your starting prices for potatoes were the same or different from the incumbent, correct?
>
> A.    Not unless I physically saw the actual offer, no.

(Trial Transcript, Jan. 18, 2008, 213:19–214:5.)

Towards the end, Sodexho threatened to walk away from both the egg and the potato negotiations unless Michael Foods granted the concessions it was seeking. In an email to Dean Sprinkle, Vicky Wass wrote the following:

> Just got off the phone with Mitch. He is extremely unhappy with us because he does not see that we have addressed his requests. He told me that if we hold with this present proposal that the egg contract will

be awarded to Sunnyfresh effective September 1, 2002 and we will not be awarded the potato contract.  He wants the following changes:

1) Take down the ceilings and floors to the original contract.
2) Readjust the formulas to the original contract.
3) Increase the 1,000,000 payment to 1.2 MM. $1,000,000 for the egg products piece and $200,000 in lieu of the reduced Better N' Eggs price.
4) Begin program January 1st which would increase the Manufacturer's rebate from 3 cents to 5 cents at that time.
5) Increase the all other products rebate at list pricing from $2.00/case to $3.00/case.
6) Mitch also wants an additional $77,000 as monetary adjustment for dollars lost by shifting the August end date to January.

They are not messing around.  These guys are the "big dogs" in contract management  and healthcare and they are pushing their position.  Please advise.  Mitch wants me to respond back to him today.

(Nov. 27, 2001 Email from Vicky Wass to Dean Sprinkle, P209.)  Ultimately Michael Foods won both the 2002 egg and potato contracts when it granted each of Sodexho's requests outlined in the email.  However, Defendants offered no evidence that these numerous additional discounts were calculated to meet rather than beat any competing offer by Sunnyfresh.  Rather, as the last paragraph of the email makes clear, Michael Foods acceded to Sodexho's demands because it was "pushing [its] position" as "'big dogs' in contract management."  (*Id.*)

Moreover, even after the contracts were signed, Michael Foods offered further discounts to Sodexho.  In 2003, during a period of great volatility in the egg market, Michael Foods voluntarily offered Sodexho a further concession on egg prices.  (*See* November 13, 2003 letter to Sodexho, P248 at 2.)   According to Wass, this discount was offered only to Sodexho and was not in response to any competitive offer by another company, but rather, as Wass explained at trial, "I offered this in the spirit of our strategic partnership with them."  (Trial Transcript, Jan. 18, 2008, 245:13–14.)

For the most part, the court found Wass to be a credible and candid witness. Nevertheless the court does not accept her assertion that the discounts granted by Michael Foods to Sodexho were offered in good faith for the purpose of meeting competition. Wass's testimony establishes that she simply did not have enough information about competitive offers from other egg and potato manufacturers to craft an offer calculated in good faith to meet, and not beat Michael Foods' competition. Indeed, for the 1999 egg negotiation and most of the 2002 egg and potato negotiation, Sodexho never made reference to any other offer by a competitor. Essentially Wass cited two reasons in support of her assumption that Sodexho had received offers from Michael Foods' competitors: (1) Sodexho's demands for lower prices were in line with what Wass expected her competitors could deliver; and (2) Sodexho is a very attractive customer likely to receive other offers from Michael Foods' competitors due to its large purchasing volume.

The court finds both of these facts insufficient to justify Wass's assumption that Sodexho had received other offers from competitors. Wass's belief that competitors could deliver the concessions Sodexho requested was based on her general knowledge of the egg market and her negotiations in other contracts. This knowledge is of little value however, given that Wass testified that she rarely learns the prices her competitors are offering. This leaves only the fact that Sodexho is a large customer likely to receive other offers from competitors due to its large purchasing volumes. However, there are two problems with inferring from this evidence that Sodexho's demands were based on its receipt of a competing offer. First, is the fact that it is in Sodexho's interest to secure a *lower* price from Michael Foods, rather than a matching price. Accordingly, it is more likely that Sodexho's

demands were calculated to beat rather than meet any other offers they may have received. Indeed, Wass testified that Sodexho repeatedly told Michael Foods where it needed to be to win the contract, which is not necessarily the same as the price needed to meet competition.

However, the greater problem is that acceptance of Wass's assumption would be contrary to the primary purpose of the Robinson-Patman Act, which is to prevent large buyers from utilizing their purchasing power to secure lower prices than their smaller competitors. If the meeting competition defense could be satisfied merely by showing that a particular customer was large and therefore likely to receive lower prices from competitors, then the Act's purpose would be largely thwarted. This is particularly true where, as here, the large buyer made no reference to any offer by any particular competitor for most of the negotiations. Moreover, when Sodexho mentioned Sunnyfresh towards the end of the negotiation, it provided Michael Foods with no information about the details or duration of that offer. Under these circumstances, Michael Foods was not in a position to make an offer reasonably calculated to meet, rather than beat the alleged offer by Sunnyfresh. In sum, the court is not persuaded that the discounts granted to Sodexho constituted a good faith offer to meet competition, rather than a concession to win the business of a large and powerful buyer.

C.    **Conclusions of Law**

Based on the factual findings, court concludes that Michael Foods failed to demonstrate a good faith effort to meet competition by other egg and potato suppliers. This case is analogous to the situation referred to in *U.S. Gypsum*, in which the seller lacks sufficient information to make a good faith offer that meets,

rather than beats that of a competitor. Instead, the court concludes that like the seller in *Viviano Macaroni*, Michael Foods' discounts were "made in an effort to obtain additional business from [the buyer] and not to defend itself against the inroads of rapacious competitors." *Viviano Macaroni Co.*, 411 F.2d at 258.

Defendants urge a different conclusion, relying upon *Great Atlantic & Pacific Tea Company*. In that case, the seller, Borden Dairy, was in negotiations with A&P, a grocery store chain, over a milk supply contract. During the course of the negotiations, A&P, a longstanding Borden customer, informed Borden that it had received a better offer from a competitor. When asked, A&P refused to provide any additional details about the offer, other than to say that the "'offer was not even in the ballpark' and that a $50,000 improvement would not be a drop in the bucket." 440 U.S. at 84. Stating that it was making the offer in order to meet competition, Borden submitted a second bid that turned out to be lower than its competitor's bid. A&P did not inform Borden that its bid was lower. On these facts, the Supreme Court found that Borden was entitled to the meeting competition defense because it reasonably relied upon a credible threat of termination by an established customer.

The instant case is distinguishable from *Great Atlantic & Pacific Tea Company* because unlike the seller in that case, Michael Foods did not seek additional information to verify Sodexho's claim that Michael Foods offer was not good enough, nor did Michael Foods inform Sodexho that it was granting the concessions for the purpose of meeting competition, rather than simply to win Sodexho's business. Accordingly, the court concludes that Defendants have failed to establish the meeting competition defense.

**V.      Inducement of Price Discrimination (Section 2(f))**

**A.      Legal Standard**

Section 2(f) of the Robinson-Patman Act provides that "[i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." 15 U.S.C. § 13(f). "[T]he buyer whom Congress in the main sought to reach was the one who, knowing full well that there was little likelihood of a defense for the seller, nevertheless proceeded to exert pressure for lower prices." *Automatic Canteen v. F.T.C.*, 346 U.S. 61, 79 (1953).

**B.      Findings of Fact and Conclusions of Law**

Based on the court's factual findings above, which the court will not here repeat, Plaintiff has demonstrated that Sodexho knowingly induced or received the price discrimination detailed above from Michael Foods. The most persuasive evidence of knowing inducement is the promise Sodexho extracted from Michael Foods known as the "most favored nations" clause. This clause required Michael Foods to provide Sodexho with the lowest price on Michael Foods products. Although it is true that the clause did not require that the price be lower than any other purchaser, it is clear that the purpose was to secure a price well below the list price received by smaller purchasers such as Feesers. This was not just form language. The evidence demonstrates that Sodexho vigorously enforced this contractual promise. For instance, in 2002, when Sodexho acquired the Wood Company, it learned that Wood had received better pricing than Sodexho on certain products. Accordingly, Sodexho demanded and received compensation for the breach of its contract.

The court's conclusion that Sodexho knowingly induced price discrimination is also supported by Sodexho's strategic planning documents demonstrating that Sodexho intended to secure discounts from manufacturers such as Michael Foods in order to increase its profit margin and gain more market share through conversion of self-op institutions to food service management. Sodexho's promotional materials touting its ability to secure lower food prices than its competitors also support this conclusion. Altogether, the evidence at trial overwhelmingly establishes that Sodexho knowingly induced Michael Foods to discriminate in price. Thus the court concludes that Sodexho violated Section 2(f) of the Robinson-Patman Act.

## VI.     Equitable Relief

As the prevailing party in this action Feesers seeks two forms of equitable relief from the court. First, Feesers seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that Michael Foods has unlawfully discriminated as to price against Feesers and that Sodexho has unlawfully induced or received such price discrimination. Second, Feesers seeks injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.[10] Specifically, Feesers seeks to enjoin Michael Foods from discriminating in price for the sale of food to Feesers and Sodexho, and to enjoin Sodexho from continuing to induce or receive unlawful price discrimination from Michael Foods or any other food manufacturer that sells food to both Feesers and Sodexho. Defendants oppose equitable relief, arguing that Feesers has unclean

---

[10] Feesers also seeks reasonable attorneys' fees and court costs, which will be considered in a separate opinion and order.

hands due to its receipt of deviated prices, that Feesers is unlikely to be injured by Sodexho's receipt of deviated prices, and that deviated pricing is critical to Michael Foods' business. These arguments will be discussed in turn.

First, the court rejects Defendants' argument that Feesers has unclean hands as a result of its receipt of deviated pricing. As discussed above, there is a significant difference between the deviated pricing received by Sodexho and Feesers. Deviated pricing received by Feesers is customer-specific.[11] Any distributor or food service management company servicing the account would have access to the same food prices. By contrast, the deviated pricing received by Sodexho may be used by Sodexho to compete for new accounts or retain current customers. As noted above, this pricing gives Sodexho a competitive advantage over smaller rivals competing to resell raw food products to institutional dining services. If a customer switches from self-op to Sodexho, it benefits from Sodexho's deviated prices, but if it reverts back to self-op or chooses another management company, it loses access to Sodexho's deviated prices.

Defendants further argue that an injunction is not necessary to protect Feesers from competitive injury because the deviated pricing it complains of has been in place for many years, and Feesers has been unable to identify any lost sales resulting from such pricing. The court rejects this argument. The court is satisfied that the level of price discrimination by Michael Foods in favor of Sodexho is great

---

[11]  This customer-specific deviated pricing would only violate the Robinson-Patman Act if it had the effect of impairing competition between favored and non-favored customers. But this scenario is unlikely. Students would not choose a school or university because one cafeteria negotiated a lower price for raw food than the other. Likewise hospitals and nursing homes are unlikely to gain a competitive advantage over rival institutions based on the price of raw food at the loading dock. However, if such a showing were made, then that price discrimination would violate the Robinson-Patman Act.

enough, and the customers for whom both Feesers and Sodexho compete are sophisticated enough, that it is a matter of time before that price disparity causes Feesers to lose customers to Sodexho.

Finally, Defendants warn the court of the allegedly disastrous consequences of barring deviated pricing to Sodexho. According to Michael Foods, the company would be forced into financial ruin if it were required to lower its prices to Feesers for resale to all customers. However, Michael Foods would not necessarily be required to extend lower prices to Feesers in order to comply with the Robinson-Patman Act. For instance, Michael Foods could raise Sodexho's price to match the national list price, or it could remain competitive by lowering the national list price. The court offers no opinion as to which method Michael Foods must adopt in order to comply with this order. However, it is clear that the Act prohibits Michael Foods from discriminating in price against Feesers and in favor of Sodexho. Accordingly, Plaintiff is entitled to an injunction prohibiting Michael Foods from engaging in such discrimination, and Sodexho from inducing such discrimination.

One aspect of the injunctive relief Feesers seeks against Sodexho merits further discussion. Feesers seeks to enjoin Sodexho from inducing or receiving discriminatory pricing not only from Michael Foods, but also from other manufacturers from which both Feesers and Sodexho purchase goods. The court declines to grant such broad injunctive relief. Although the evidence presented at trial suggests that Sodexho has negotiated price discounts with manufacturers other than Michael Foods, those manufacturers are not named as parties to this suit, and the details of their pricing arrangements with Sodexho are not before the court. Thus the court is in no position to determine whether Sodexho has knowingly induced or

received price discriminatory pricing from other manufacturers. Accordingly, the court will enjoin Sodexho from inducing or receiving discriminatory pricing from Michael Foods, but the injunctive relief shall not extend to other manufacturers.

**VII.**        **Conclusion**

For the foregoing reasons, the court finds in favor of Plaintiff. Defendant Michael Foods violated Section 2(a) of the Robinson-Patman Act by discriminating in price between competing purchasers, and Sodexho violated Section 2(f) of the Act by inducing such discrimination. An appropriate order will issue.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: April 27, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FEESERS, INC.,** | : | **CIVIL NO. 1:CV-04-0576** |
| **Plaintiff,** | : | |
| | : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : | |
| **MICHAEL FOODS, INC. and SODEXHO, INC.,** | : | |
| **Defendants.** | : | |

**O R D E R**

In accordance with the foregoing memorandum of law, **IT IS HEREBY ORDERED AND ADJUDGED THAT**:

(1) The Clerk of Court shall enter judgment as follows:

(a) Michael Foods has unlawfully discriminated as to price against Feesers and Sodexho has unlawfully induced or received such price discrimination in violation of the Robinson-Patman Act.

(b) Michael Foods is hereby enjoined from discriminating unlawfully in price in favor of Sodexho and against Feesers.

(c) Sodexho is hereby enjoined from continuing to induce or receive unlawful price discrimination from Michael Foods.

1

(2) No later than 30 days from the date of this order, Plaintiff shall submit a petition for reasonable attorneys' fees and costs, supported by affidavits describing the experience of the attorneys and their standard hourly rates. Thereafter Defendants shall have 30 days to submit a response to the petition.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: April 27, 2009.